Stephen A. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 89–322.

District of Columbia Court of Appeals.

Argued March 5, 1990.

Decided Nov. 14, 1990.

Ted Kavrukov, appointed by this court, for appellant.

Thomas J. Tourish, Jr., Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and BELSON, Associate Judges.

ROGERS, Chief Judge:

Appellant Stephen A. Smith appeals his conviction by a jury of failure to appear in court, D.C.Code § 23–1327 (1989 Repl.), on the grounds that there was insufficient evidence and that the trial judge erred in admitting irrelevant evidence of the general practice of courtroom clerks. Since the written notice directed appellant to the wrong courtroom, the judge having changed courtrooms since the notice was issued, the government had to prove that appellant received timely notice of the courtroom in which he was to appear in order to meet its burden of proof that appellant had willfully failed to appear "as required." Accordingly, we hold, consistent with the principles embodied in Federal Rule of Evidence 406, that evidence about the general practice of courtroom clerks when judges change courtrooms is properly admissible as relevant to the issue of whether appellant willfully failed to appear. We further hold, however, that for

the evidence to be probative, a foundation must be established for the witness' basis of knowledge of the general practice, and because of the absence of such a foundation, the evidence was improperly admitted.

I

The government presented two witnesses at trial. A police officer testified that appellant was arrested on May 20, 1988, for carrying a dangerous weapon. A Deputy Courtroom Clerk, Janice Allen, who was assigned to the Criminal Division of the Superior Court, testified that appellant appeared in court before Judge Burnett on June 29, 1988, and a notice to return form dated June 29, 1988, bore appellant's name and signature, and the signature of another courtroom clerk. The form stated that appellant's status hearing in Case No. M5903–88 would be before Judge Queen, and that he was to return to appear before Judge Queen in misdemeanor court, in courtroom 19 on the second level of the District of Columbia Superior Court at 500 Indiana Avenue, N.W., on July 18. Other entries in the trial jacket indicated that appellant did not appear before Judge Queen for the July 18, 1988, status hearing, and that a bench warrant was issued that day.

Allen also testified that on July 18, 1988, Judge Queen was presiding in courtroom 25, and not in courtroom 19, and had issued a bench warrant for appellant from courtroom 25. Allen, the clerk for courtroom 25 on that date, admitted that she did not know which judge was sitting in courtroom 19 on July 18 or whether appellant had appeared in courtroom 19 on July 18. Nor had she personally gone to look for appellant in courtroom 19 on July 18.

Over defense objection, Allen testified on redirect examination that when a judge changes courtrooms it is the general practice of courtroom clerks to post "a note or a sign ... on the front of the [former] courtroom" indicating the new courtroom

in which the judge is sitting.[1] In response to a question about her practice when she sees a person whose case has not been called sitting in the courtroom, Allen testified, also over defense objection, that "we generally asked them why are they here or if we can help them, do they have a case on the calendar." Allen further testified, in response to a question about what the general practice of the courtroom clerk is for checking up on people if there has been a change in the courtroom, that "[n]ormally what happens is that the defense counsel or the clerk who is in the courtroom that has been changed will call and either say we have extra people here, we're going to direct them to your courtroom, or the defense counsel himself will go up and see if he can find his client." On recross-examination, Allen conceded that she did not know whether these practices were employed in appellant's case, or whether a sign had been posted on the door of courtroom 19 on July 18, 1988.

To rebut Allen's testimony about the "general practice," appellant called Louis Kleiman, an attorney who had practiced in the Superior Court beginning in 1972. He testified that 95 percent of his practice involved criminal cases and that he was generally in court five days a week. To locate judges he relied on the daily schedule listing judges' courtroom assignments distributed by the information center. Commenting that "[i]t's not uncommon to have difficulties" locating judges, Kleiman testified that it was his experience that "sometimes there's a note posted on the door that the judge moved to a different courtroom, but sometimes there's not. So that sometimes it's just trial and error." Indeed, he testified that more often than not there is not a notice on the courtroom door indicating the judge's new courtroom.[2] He also testified that, because of his heavy caseload, it was not his practice to look for his client to notify the client of the new courtroom. On cross-examination he stated that he was unaware of any court rule that required defendants to contact the Pretrial Services Agency or the courtroom where they are supposed to appear if they cannot appear in court. A certified copy of a judicial assignment sheet dated July 18, 1988, which, Kleiman and an employee of the information center identified, indicated that Judge Queen was assigned to courtroom 22 (not 25) on July 18 through 22, 1988. Kleiman, who did not know appellant, had not seen him in courtroom 19 or courtroom 22 on July 18, 1988.

Appellant testified that on June 29, he was told by a courtroom clerk of the penalties of failing to appear and he signed a notice-to-return-to-court form for July 18. He claimed that on July 18, 1988, he had reported to courtroom 19 at 8:30 a.m., and had remained there until late morning. He saw neither a sign nor a note on the courtroom 19 door directing people to a different

1. The proceedings were as follows:
   REDIRECT EXAMINATION
   [The prosecutor]:
   Q. Ms. Allen, if—Let me rephrase that. In your knowledge as a courtroom clerk, does it ever occur that a courtroom is changed?
   A. Yes.
   Q. And if a courtroom is changed, do you know if some type of notice is posted?
   [Defense counsel]: Objection.
   THE COURT: She can ask what the practice is.
   [Defense counsel]: Well, I realize that, but there is no—Unless she can testify as to what happened in this case, then I believe it would be irrelevant.
   [The prosecutor]: Your Honor, that's in general. Is it her knowledge that—
   THE COURT: Well, you're asking whether she specifically knows this on that particular day?
   [The prosecutor]: No. I'm not.

   THE COURT: Just in general?
   [The prosecutor]: Right.
   THE COURT: I will allow this question as to the practice, at this point. You will be able to go so far as that.
   [The prosecutor]:
   Q. Do you know what the general practice of the courtroom clerk is if a courtroom is changed?
   A. The general practice of courtroom clerks when courtrooms are changed is there is a note or a sign put up on the front of the courtroom. Say for instance in this case, it would have been 19, saying that Judge Queen has moved all of her matters to Courtroom 25.

2. On cross examination he elaborated that such notices as there are consist only of a piece of paper that is attached to the courtroom door with scotch tape, and that while a note might be on the door the first day that a judge had changed courtrooms it might not stay there.

courtroom. He did not ask the courtroom 19 clerk whether his case was scheduled, but at midday went to the Information Desk in the lobby of the courthouse to inquire where he was supposed to be and was told to go to courtroom 22. He did, and he remained there until 5:00 p.m.. Appellant admitted that he had not called the Pretrial Services Agency to inform it that he could not find Judge Queen, nor did he show the clerk in either courtrooms 19 or 22 his notice to appear slip. He claimed, however, that he had called his attorney the next day. Appellant was impeached with four prior convictions [3] and admitted that he had previously been in the District of Columbia Courthouse on five occasions in connection with four criminal cases.

## II

■ To convict of willful failure to appear, D.C.Code § 23–1327(a), the government must prove beyond a reasonable doubt that the defendant (1) was released pending trial or sentencing, (2) was required to appear in court on a specified date or at a specified time, and (3) failed to appear, and (4) that the defendant's failure was willful. *Trice v. United States,* 525 A.2d 176, 179 (D.C.1987); *Raymond v. United States,* 396 A.2d 975, 976 (D.C. 1979). Appellant contends that there was insufficient evidence he had proper notice to appear and that his failure to appear was willful.[4] Specifically, he maintains that there was no evidence he did not appear in courtroom 19 "as required", nor was there evidence that there was a sign on the door of courtroom 19 directing persons to courtroom 25.[5] The government maintains that it presented a *prima facie*

case when it demonstrated that appellant was released on his own recognizance after signing a notice-to-return slip and failed to appear in court on July 18, 1988. It relies on *Trice, supra,* 525 A.2d at 181, where the court stated that "[a]ny failure to appear after notice of the appearance date shall be prima facie evidence that such failure to appear is willful" (quoting D.C.Code § 23–1327(b)).

This case is not the usual bail jumping case since, as the court observed in *Trice,* in most bail jumping cases the government's proof of the first three elements of the government's evidence is not contested. *Trice, supra* at 179. Nevertheless, it is beyond dispute that the government bears the burden of proving that the defendant willfully failed to appear after receiving notice to do so. *Id.* Indeed, the statute precisely requires the government to prove that the defendant "willfully fail[ed] to appear before any court or judicial officer *as required . . . .*" D.C.Code § 23–1327(a) (emphasis added). Here, the prosecution was based on appellant's failure to appear for a status hearing on July 18, 1988, before Judge Queen, who was then sitting in courtroom 25. The notice-to-return form instructed appellant to appear in courtroom 19. Our previous cases have not considered the nature of the notice that is required when the notice-to-return slip given to the defendant misstates the courtroom in which the named judge is actually presiding on the return date. However, in *Raymond, supra,* the court rejected a due process challenge to the statute, explaining that the statute creates merely a permissi-

---

**3.** Two of the convictions were for possession of marijuana and two were for distribution of marijuana.

**4.** Our standard of review of a claim of insufficient evidence is well settled. *See, e.g., In re A.B.,* 556 A.2d 645, 649 n. 8 (D.C.1989); *Ford v. United States,* 498 A.2d 1135, 1137 (D.C.1985); *see also White v. United States,* 484 A.2d 553, 557 (D.C.1984); *Easley v. United States,* 482 A.2d 779, 781 (D.C.1984); *Reid v. United States,* 466 A.2d 433, 435 (D.C.1983); *In re Q.L.J.,* 458 A.2d 30, 32 (D.C.1982).

**5.** Appellant's other contentions regarding the insufficiency of the evidence border on the frivolous. Thus, he maintains that the notice to

return form was deficient because it failed to state the year in which he was to return to court on July 18; that he should have been orally notified of the July 18, 1988, date at the time of his release; and that there was no evidence that the Steven Smith who signed the release notice is the same man who stood trial. While the notice form did not specify a year, appellant was not confused or prejudiced by the omission, and inasmuch as he claims he reported to courtroom 19 on July 18, 1988, the notice was sufficient to achieve its purpose. Appellant, in fact, testified that he was advised of the penalties of failing to appear, and he identified his signature as the signature appearing on the form.

ble, and not a mandatory, inference of willfulness based on the defendant's failure to appear "at a certain place at a particular time and date." 396 A.2d at 978. Further, in *Trice*, the court held that willfulness must be shown by evidence that the defendant's failure to appear was knowing, intentional and deliberate rather than inadvertent or accidental. 525 A.2d at 181. It logically follows that the government must prove that the defendant received timely notice of where he was required to be. *See Mullane v. Central Hanover Trust Co.* 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950) (where liberty is at stake, due process requires notice and opportunity appropriate to the nature of the case; "notice must be of such nature as reasonably to convey the required information"). *See also* 2 ROTUNDA, NOWAK & YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 17.8, at 262 (1986) ("the form of the notice and the procedure for delivery or the posting of the notice must be reasonably designed to insure that the interested parties in fact will learn of the proposed adjudicative action").[6]

Accordingly, to convict appellant of willful failure to appear before Judge Queen on July 18, 1988, the government had the burden to show that appellant received timely notice to return to a certain place at a certain time, here notice that was sufficient to inform him that Judge Queen would be hearing his case in courtroom 25.

While a defendant undoubtedly has an obligation to act diligently with respect to returning as required for a further court proceeding, the notice-to-return form that appellant received did not, of itself, provide appellant with sufficiently accurate or complete notice of the location of the next scheduled proceeding to guide his efforts to reappear.[7] In light of the change in location of the hearing, we disagree with the government's position that it presented a *prima facie* case when it demonstrated that appellant had been released on his own recognizance after signing the particular notice-to-return slip in question. Rather, in order to make out a *prima facie* showing of a willful failure to appear, the government had to present, in addition, either direct evidence that appellant was personally informed of where his case was to be called, or comparable circumstantial evidence, *e.g.*, evidence of what occurred in or around Courtroom 19 on July 18, 1988, to notify persons where Judge Queen (or some other judge) would hold the scheduled hearing. The question is whether the government may meet its burden by presenting evidence of the general practice of the courtroom clerks regarding notice when judges change courtrooms.

### A.

Under Federal Rule of Evidence 406, evidence of the routine practices of an orga-

---

**6.** *See, e.g., Greene v. Lindsey,* 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (posting notice of eviction action on door of public housing unit insufficient to meet due process standard because the notices were "'not infrequently' removed by children or other tenants before they could have their intended effect"); *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978) (notice of possible termination of utility service while sufficient for that limited purpose, held defective for failure to "advise customer of the availability of a procedure for protesting a proposed termination of service as unjustified"); *see Ford v. Turner,* 531 A.2d 233, 236 (D.C.1987) (citing *Memphis Light, Gas & Water Division v. Craft, supra,* 436 U.S. at 13, 98 S.Ct. at 1562) ("[appellant] was entitled to notice that certain property had been seized, that the District sought to retain the property pursuant to specified authority, and that a claimant could take particular steps to challenge the District's ac-

tion"). *See also Evans v. Evans,* 441 A.2d 979, 980 (D.C.1982) ("[v]iolation of the Superior Court rules which provide for notice and an opportunity to be heard have the effect of denying a litigant due process of law").

**7.** The Superior Court may wish to consider revising the form-of-release notice to make clear what a defendant must do upon arriving at the courtroom stated in the notice, and thereby avoid the evidentiary problem presented in the instant appeal. The form might provide, for example, that if a defendant's case is not called by a certain time, the defendant shall confer with the courtroom clerk and, if that does not clarify the matter of where defendant's case is to be heard, shall promptly contact the Pretrial Services Agency. For reasons discussed *infra,* the Superior Court may also wish to revise the method by which public notice is given that a judge has changed courtrooms.

nization, whether corroborated or not and regardless of the availability of eyewitnesses, is admissible to show that the conduct of the organization on a particular occasion was in conformity with the routine practice.[8]  In the context of Rule 406, the practice of an organization is behavior on the part of a group which is equivalent to habit of a person, that is, an organization's practice of responding to a particular kind of situation with a particular kind of conduct. *See* Notes of Advisory Committee on Proposed Rules (Notes of Advisory Committee), citing "an oft-quoted paragraph" in McCormick on Evidence § 162, at 340 (Cleary ed. 1984).[9]  The heightened probativity of organizational practice evidence is based on the "assumption that individuals within that organization have a tendency or propensity to conform to the routine practice of the organization."  1A Wigmore, Evidence § 93 at 1624 n. 8 (Tillers Rev. 1983).  The rationale of the rule thus appears to adopt McCormick's characterization that the doing of habitual acts becomes "semi-automatic."  *See* Notes of Advisory Committee on Proposed Rules at 285.  The rule rejects the requirement that evidence of routine practice of an organization be corroborated as a condition precedent to its admission in evidence on the ground that requirement relates to the sufficiency of the evidence rather than its admissibility.  *Id.* at 286.

■  To prove the existence of a general practice, evidence must be offered to demonstrate the uniformity of the regular response.  The party offering the evidence must proffer instances sufficient in number to warrant a finding that the habit or routine existed in fact.  *See* Notes of Advisory Committee at 285–86.  Thus, the Fourth Circuit has stated, in view of the "somewhat strict requirements for the proof of habit or pattern of conduct as established by both the Federal Rules of Evidence and the authorities in general," that "[w]hile precise standards for measuring the 'extent to which instances must be multiplied and consistency of behavior maintained in order to support an inference of habit or pattern of conduct cannot be formulated,' it is obvious that no finding is supportable under Rule 406 ... which fails to examine critically the 'ratio of reactions to situations.'"  *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 512 (4th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978).  In a similar vein, the Eleventh Circuit Court of Appeals, relying on the Advisory Committee Notes, has stated that "[t]he key criteria are the 'adequacy of sampling and uniformity of response or ratio of reactions to situations.'"  *Loughan v. Firestone Tire & Rubber Co.,* 749 F.2d 1519, 1524 (11th Cir.1985) (quoting Notes of Advisory Committee at 285).

■  The cases and the commentary make clear that courts should be cautious in permitting admission of habit or pattern of conduct evidence under Rule 406 because of the danger that it may afford a basis for improper inferences, cause confusion, or operate unfairly to prejudice a party.  *See Wilson v. Volkswagen of America, Inc., supra,* 561 F.2d at 511 (citing McCormick on Evidence § 162 at 341–42).[10]

---

**8.**  Federal Rule of Evidence 406, Habit; Routine Practice, provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

**9.**  McCormick explains that while character and habit are "close akin," *id.* § 162, at 341, character evidence is a generalized description of a person's disposition and frowned upon by courts when introduced to demonstrate how a person acted on a particular occasion.  Habit evidence, on the other hand, is more specific because it denotes a person's regular response to a repeated situation to the point where "the doing of the habitual act may become *semi-automatic....*"  *Id.* § 195, at 575 (emphasis added).

**10.**  Professor Wigmore suggests:

> If we conceive [habit evidence] as involving an *invariable regularity of action,* there can be no doubt that this fixed sequence of acts tends strongly to show the occurrence of a given instance.  But in the ordinary affairs of life, a habit or custom seldom has such an invariable regularity.  Hence, it is easy to see why in a given instance something that may be loosely called habit or custom should be rejected because it may not in fact have sufficient

As the Eleventh Circuit Court of Appeals, joining the Fourth Circuit, has written: "We stress that 'habit or pattern of conduct' is never to be lightly established, and evidence of example, for purposes of establishing such a habit, is to be carefully scrutinized before admission.' " *Loughan v. Firestone Tire & Rubber Co., supra,* 749 F.2d at 1524 (quoting *Wilson v. Volkswagen of America, Inc., supra,* 561 F.2d at 511). To the same effect is the opinion of the Seventh Circuit Court of Appeals in *Simplex Inc. v. Diversified Energy Systems, Inc.,* 847 F.2d 1290 (7th Cir.1988), that "the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." 847 F.2d at 1293 (citing Notes of the Advisory Committee and 23 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE, § 5273, at 33 (1980)). *See also G.M. Brod and Co., Inc. v. U.S. Home Corp.,* 759 F.2d 1526, 1533 (11th Cir.1985) (defendant's former employee's "testimony of specific instances of [defendant's] operation within his personal experience, when considered in light of [defendant's] contractual dealings with thousands of small subcontractors and the significant differences between the types of contracts involved and the course of dealing required of them, falls short of the adequacy of sampling and uniformity of response which are controlling considerations governing admissability"); 2 WIGMORE, EVIDENCE, supra, § 376, at 385. Consequently, the strictly enforced threshold requirement for the admission of general practice evidence under Fed.R. Evid. 406 is satisfied "only when the examples offered to establish such pattern of conduct or habit are 'numerous enough to base an inference of systematic conduct' and to establish 'one's regular response to a repeated specific situation.' " *Wilson v.*

*Volkswagen of America, Inc., supra,* 561 F.2d at 511.

■ A further threshold requirement relates to the competence of a witness to testify about the general practice of an organization. This threshold requirement is also strictly enforced. Thus, a witness may testify regarding general practices only upon a showing that the witness has a basis of personal knowledge on which to rely. In *United States v. Quezada,* 754 F.2d 1190, 1196 (5th Cir.1985), a border patrol officer was found competent to testify to normal procedures in executing a search warrant because he had performed various functions, including traffic check, line watch and service as a warrant officer. On the other hand, the Seventh Circuit held in *Kaczmarek v. Allied Chemical Corp.,* 836 F.2d 1055, 1060 (7th Cir.1987), that a safety director hired in 1984 was incompetent to testify to safety procedures in 1979 because his knowledge of 1979 safety procedures was based on the "say-so of other people" and was inadmissible hearsay. Similarly, in *Mathes v. The Clipper Fleet,* 774 F.2d 980, 984 (9th Cir.1985), the Ninth Circuit held that "the mere fact that [the witness] had observed the transfer of only small items under these conditions does not, standing alone, qualify him to testify that, as a matter of industry practice, large items were not transferred." *See* FED.R. EVID. 602 ("witness may not testify unless evidence is introduced to support finding of personal knowledg[e]"). In the states that have adopted Fed.R.Evid. 406 or its equivalent, the personal knowledge requirement is the same.[11] *See, e.g., Weisenberger v. Senger,* 381 N.W.2d 187 (N.D.1986) (witness not shown to have observed decedent with sufficient frequency to know of habit); *Eig v. Insurance Co. of North America,* 447 So.2d 377 (Fla.App.1984) (employee incompetent to testify to what the routine practice was before he was hired [Florida

regularity to make it probable that it should be carried out in every instance or in most instances. Whether or not such sufficient regularity exists must depend largely on the circumstances of each case.

1A WIGMORE, EVIDENCE, *supra,* § 92 at 1608–1609 (emphasis added).

11. Thirty-one states have adopted a code of evidence based on the Federal Rules of Evidence. G. JOSEPH & S. SALTZBURG, EVIDENCE IN AMERICA, THE FEDERAL RULES IN THE STATES, xxiii (1987). Twenty-one states have adopted Federal Rule 406 verbatim. WEINSTEIN, EVIDENCE 406–1, 406–23–30 (1988).

rule 406 does not permit the admission of habit evidence, only general practice evidence]); *Laszko v. Cooper Laboratories, Inc.,* 114 Mich.App. 253, 318 N.W.2d 639 (1982) (defendant's witness testified that he did not know what kind of warnings were placed on packages of drug between years 1958 and 1966; therefore defendant failed to demonstrate witness knew the practice of the pharmaceutical industry as it related to warning labels).

This court has not yet subscribed to the evidentiary principles set forth in FED.R. EVID. 406,[12] nor has it addressed whether evidence of general practice or habit evidence is admissible other than in a contractual context. *In Lucas v. Auto City Parking Co.,* 62 A.2d 557 (D.C.1948), for example, the court described custom. evidence, stating that "[a] custom, to be binding, 'must be certainly shown to be the general usage of the trade. * * * It must be definite, uniform, well known, and should be established by clear and convincing evidence.' " 62 A.2d at 559 (footnote and citations omitted). *See Goldberg v. Stouck,* 76 A.2d 785, 787 (D.C.1950) (same). The issue in *Lucas* was whether the defendant was the bailee of personal property left in the plaintiff's car when the plaintiff parked his car on the defendant's parking lot. The plaintiff contended that "a custom had grown up under which they and others had repeatedly left personal belongings in cars

parked on the lot and that liability should be predicated on such custom." *Lucas, supra,* 62 A.2d at 559. The court noted that if such a custom existed, it was unilateral since there was no evidence of defendant's agreement to or knowledge of it.[13] This is not the type of general practice evidence that is at issue here, however.

The nature of personal habit evidence was examined by the United States Court of Appeals for the District of Columbia Circuit in *Levin v. United States,* 119 U.S. App.D.C. 156, 161, 338 F.2d 265, 270 (1964). Where direct evidence of a defendant's location on the date at issue was presented through the testimony of an eyewitness, the court affirmed the trial judge's refusal to admit cumulative evidence of the defendant's religious practices as part of his alibi defense.[14] The court noted that evidence of a person's general habits is inadmissible, according to the. weight of authority, but agreed, citing WIGMORE, *supra,* § 92, at 1607–10, that "it is of *some* probative value although ... far inferior to direct evidence as to what was done at the time and date in question." 119 U.S.App.D.C. at 162, 338 F.2d at 271 (emphasis in original). More specifically, and relevant here, the court viewed the probative force of habit evidence to be in inverse proportion to the extent the habit involves volitional activity.[15]

**12.** *See* S. GRAAE AND B. FITZPATRICK, THE LAW OF EVIDENCE IN THE DISTRICT OF COLUMBIA—CASES AND STATUTES ANNOTATED TO THE FEDERAL RULES OF EVIDENCE (1989).

**13.** *See also Howard University v. Best,* 484 A.2d 958 (D.C.1984) (party against whom the habitual or customary practice is offered must have knowledge of it or reason to know of it); *1901 Wyoming Avenue Corp. v. Lee,* 345 A.2d 456 (D.C.1975) (same); *McDevitt v. Waple & James,* 34 A.2d 39, 40 (1943) (custom must be definite, uniform, and well known, and should be established by clear and satisfactory evidence).

**14.** The court distinguished *Howard v. Capital Transit Co.,* 97 F.Supp. 578 (D.D.C.1951), as involving an exception to the general rule that habit testimony was inadmissible since the decedent was unavailable and there were no eyewitnesses. 119 U.S.App.D.C. at 163, 338 F.2d at 272. Chief Judge Bazelon saw no reason to exclude habit evidence simply because there is

an eyewitness. 119 U.S.App.D.C. at 167 n. 2, 338 F.2d at 276 n. 2.

**15.** The court quoted CHAMBERLAYNE, MODERN LAW OF EVIDENCE, § 3204, at 4433:

The probative force of habit, whether the question arises in a civil or criminal case, is based principally upon the fact that habitual conduct is largely free from the complicating and confusing element of volition which makes the relevancy of moral conduct merely deliberative, but, on the contrary, brings such conduct in line with the activities of the body which are under the control of the subliminal mind, i.e. are of the automatic nature, practically under the uniformity of natural law. In fact, the probative strength of habit is in proportion to the extent to which it assumes this automatic character.

119 U.S.App.D.C. at 163, 338 F.2d at 272. In *Levin, supra,* the court also quoted with approval *Zucker v. Whitridge,* 205 N.Y. 50, 65, 98 N.E. 209, 213 (1912), for the proposition that habit

B.

■ Because of the general principles discussed in the cases in this jurisdiction, we find persuasive the rationale underlying FED.R.EVID. 406, and apply the principles embodied in the rule. *See Rogers v. United States,* 566 A.2d 69 (D.C.1989) (en banc) (applying principles embodied in FED.R. EVID. 405(a) (opinion evidence)). The general practice of the courtroom clerks is undoubtedly an organizational or institutional practice necessary for the efficient operation of the trial court. Judges will, for a variety of reasons, change courtrooms. The general practice need not, in our view, be set by rule nor otherwise formally promulgated, as, for example, by an internal procedure of the Criminal Division Clerk's Office. It will suffice to qualify as routine practice under Rule 406 if the conduct of the courtroom clerks is shown, by opinion or evidence of repeated instances,[16] to be characterized by a high degree of reliability and not to be wholly voluntary or solely a matter of individual choice or whim.[17] *Accord Lucas v. City Parking Co., supra,* 62 A.2d at 559.

■ The general practice of courtroom clerks when judges change courtrooms was logically relevant to whether appellant willfully failed to appear before Judge Queen. *See Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978) (evidence is relevant where it relates logically to the fact that it is offered to prove and that fact is "material"). Any single piece of relevant evidence, standing alone, need not be sufficient for the court to permit the case to go to the jury. *Id.* at 78. But the evidence of the general practice of the courtroom clerks could be probative of appellant's willfulness because it would tend to show the implausibility of appellant's testimony that he sat in the wrong courtrooms all day without seeing a posted notice or any court personnel inquiring about his presence or where he was scheduled to be. *Id.* (evidence is probative when it tends "to make the existence or nonexistence of a [material] fact more or less probable than would be the case without that evidence") (quoting *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977)).

The District of Columbia, along with every other jurisdiction, requires a minimal showing of competence before a witness may testify as to any matter. *See District of Columbia v. Gandy,* 458 A.2d 414, 415 (D.C.1983); *O'Neil v. Bergan,* 452 A.2d 337, 343–44 (D.C.1982). Under Federal Rules of Evidence 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602; *see* S. SALTZBURG & M. MARTIN, FEDERAL RULES OF EVIDENCE MANUAL, at 529 (5th ed. 1990)

---

evidence "should be held incompetent ... when its probative value does not outweigh the inconvenience of a multiple of collateral issues [that would arise were so many acts that constitute a habit to be separately tried, thereby] consuming much time [and] would tend to distract the jury and lead them away from the main issue to be decided." *Id.* at 162, 338 F.2d at 271.

16. The Final Draft of Federal Rule 406 contained a subdivision (b) which stated:
(b) Method of Proof: Habit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
Congress deleted subdivision (b) and the House Committee on the Judiciary stated:
The Committee deleted this subdivision believing that the method of proof of habit or routine practice should be left to the courts to deal with on a case-by-case basis.

H.R.Rep. No. 93–950, 93rd Cong., 1st Sess. (1973).

17. The language of Rule 406 with respect to the "routine practice of an organization" is not precise. 23 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE, *supra,* § 5274, at 43–49. Professors Wright and Graham define the term to include the following elements: the conduct is of such a nature that it is unlikely that the individual instance can be recalled; it is frequently engaged in by groups; and it is fairly easy to prove (because the number of instances is large enough that doubt about a single instance does not destroy the inference that the practice existed). *Id.* at 46–48. The entity to which the conduct applies is to be defined, suggests Judge Weinstein, in the same terms as used to define a business under the business records exception to the hearsay rule. *Id.* at 49.

**984**

("Without some evidence to demonstrate that the ordinary lay witness has some personal knowledge ... the testimony should not be admitted"). FED.R.EVID. 701 on lay opinion incorporates the same personal knowledge requirement.[18] *Id; see Samples v. City of Atlanta*, 846 F.2d 1328, 1334 (11th Cir.1988) (opinion of witness who worked in a police department for a long time that the department had a policy or practice of encouraging brutality was admissible because it was based on his own personal observations). Under Fed.R.Evid. 602, objections to lack of personal knowledge "should be made at the earliest possible time; once a witness has given testimony, a motion to strike is the only available remedy." SALTZBURG & MARTIN, FEDERAL RULES OF EVIDENCE MANUAL, *supra*, at 530; *cf. Pyne v. Jamaica Nutrition Holding, Ltd.*, 497 A.2d 118, 128 (D.C.1985) (failure to object to earlier like evidence does not preclude a later objection or a motion to strike).

Appellant objected to Allen's testimony about the general practice of courtroom clerks on the ground that Allen lacked knowledge about what had occurred in courtroom 19 on July 18, 1988 (with respect to leaving a note on the courtroom door or speaking to persons in the courtroom). These objections missed the mark to the extent that they did not expressly challenge Allen's competence to testify about the general practice of courtroom clerks; appellant also did not thereafter move to strike Allen's testimony. But the colloquy between the trial judge and counsel following the defense objections indicates that the judge was alerted by the prosecutor to the fact that Allen's testimony was being offered to show a general practice.[19] *See* note 1, *supra*. Also, it was the clear inference from the defense evidence: that since there was no uniform practice Allen could not possibly testify that there was. Thus, we do not view counsel's statement to have been a concession either that a general practice existed or that Allen was competent to testify about the nature of the general practice.

▪ Even assuming the trial judge provisionally allowed Allen to testify, *see* SALTZBURG & MARTIN, FEDERAL RULES OF EVIDENCE MANUAL, *supra*, at 530; *cf. Gorby v. Schneider Tank Lines, Inc.*, 741 F.2d 1015, 1021 (7th Cir.1984), it was clear by the time the defense moved for a judgment of acquittal at the close of the government's case, and again after all of the evidence had been presented in the case, that the government had yet to demonstrate that Allen had a sufficient basis of knowledge, within the meaning of Rule 406, about the general notice practices of courtroom clerks when judges change courtrooms. No basis for Allen's knowledge was established during her direct examination beyond the fact that she was a Deputy Courtroom Clerk in the Criminal Misdemeanor Division. By virtue of her position, Allen presumably was familiar with the responsibilities of a courtroom clerk. But this is not the same as demonstrating that she also had a basis for knowing what other

---

**18.** Rule 701, Opinion Testimony by Lay Witnesses provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Professors Saltzburg and Martin explain:

> that it is important to note that Rule 701 requires that the opinion be based on personal knowledge; the Rule is not designed to encourage speculation on the part of the witnesses concerning events that they have not perceived. Moreover, the Rule implies that the Judge may exclude opinion evidence if it is confusing or it is not helpful in clarifying the testimony of the witnesses and in understanding the facts of the case.

SALTZBURG and MARTIN, 2 FEDERAL RULES OF EVIDENCE MANUAL, *supra*, at 2.

**19.** McCORMICK ON EVIDENCE, *supra*, § 10, at 24 ("The burden of laying a foundation by showing that the witness had an adequate opportunity to observe is upon the party offering the testimony. By failing to object the adversary waives the preliminary proof, but not the substance of the requirement, so that if it later appears that the witness lacked opportunity, or did not actually observe the fact, the testimony must be stricken."). *Cf. Pyne v. Jamaica Nutrition Holdings Ltd., supra*, 497 A.2d at 126 (error in admission of evidence will generally be deemed harmless if no objection is made).

courtroom clerks normally did when judges changed courtrooms. It is impossible to determine from the record whether she was new on the job or a seasoned veteran. Her knowledge may have been based on discussions with some courtroom clerks but assuredly not with most courtroom clerks. There was no evidence to suggest how often Allen or other clerks posted notices on courtroom doors or inquired of the status of persons sitting in the courtroom whose cases were not called. Indeed, the prosecutor's second question to Allen about what courtroom clerks did, *see* note 1, *supra,* possibly suggested that Allen was being asked to relate anecdotal rather than general practice evidence; although the prosecutor clarified, in response to the judge's inquiry, that he was asking about general practice, he made no further effort to lay a foundation for Allen's testimony. This failure went unremedied despite defense evidence from an experienced attorney that the courtroom clerks' responses when judges changed courtrooms were unpredictable at best.

Allen's testimony was assuredly limited in scope and length. She described what was normally done as opposed to what was always done or what was done in appellant's case. She did not purport to describe practices that were established by rule of court or internal operating procedures. Rather, she reported what she understood to be the practice of other clerks when judges changed courtrooms. But in the absence of any evidence about the level of her experience in the Superior Court or how she came to know what other courtroom clerks did and whether this was a routine practice of the courtrooms clerks, as distinct from happenstance, as Kleiman's testimony suggested, a foundation had not been established for her testimony about the general practices. That appellant was free to inquire of Allen's level of experience and to present evidence impeaching Allen's testimony of what regularly happened—which he did through Klei-

man's testimony and the introduction of the court assignment sheet—did not relieve the government, as the proponent of Allen's testimony, of its burden to establish a foundation for the admission of her general practice testimony. *See* note 18, *supra.*

▮▮▮ In the absence of a foundation for her testimony, the evidence on the general practice of courtroom clerks when judges change courtrooms was not probative. Kleiman's testimony highlighted the insufficiency of the foundation for Allen's testimony to establish that the practices occurred with a high degree of reliability and were not wholly voluntary. The record, in short, would not support a finding by the trial judge that the practices described by Allen were the semi-automatic routine practice evidence that is contemplated by Rule 406. *See Simplex, Inc. v. Diversified Energy Systems, Inc., supra,* 847 F.2d at 1293 ("[o]ffering party must establish the degree of specificity and frequency of response that ensures more than a mere 'tendency' . . .").[20] Accordingly, we hold that Allen's testimony about the practice of courtroom clerks was inadmissible, and either should not have been admitted initially in the absence of a foundation indicating the basis of Allen's knowledge of the courtroom clerks' practice or should have been struck when it became clear that a foundation was lacking. Given the improper inference that the jury was likely to draw from Allen's testimony, because of her identification of herself as a Deputy Courtroom Clerk in the Criminal Misdemeanor Division who was generally knowledgeable about the general duties of courtroom clerks and the specific procedures used for notifying a defendant to return to court, the error was not harmless. *Pyne v. Jamaica Nutrition Holdings Ltd., supra,* 497 A.2d at 126.

In sum, appellant's failure to appear for his status hearing before Judge Queen could not, as a matter of law, be found to have been willful in the absence of evi-

---

**20.** *See also Punch, supra,* 377 A.2d at 1358 (when evidence is probative "but possesses the potential for prejudicial misuse by the jury, the trial judge, in the exercise of his [or her] discre-

tion as to its admission, must weigh the probative value against the risk of prejudicial impact").

dence that he was timely notified of his obligation to appear there. The statutory inference of willfulness could not provide the basis for a conviction in the absence of a showing that appellant had received notice of where he was to appear. The government, to show willfulness, attempted to demonstrate that the general practice of courtroom clerks would have given him notice that Judge Queen would be hearing his case in courtroom 25.[21] Without a foundation for the basis of Allen's knowledge of the general practice of courtroom clerks when judges change courtrooms, evidence was improperly put before the jury regarding an element of the offense which the government had the burden to prove. Without Allen's testimony about the general practice, the government failed to meet its burden of proof to show that appellant's failure to appear was willful.

Accordingly, the judgment is reversed and the case is remanded for a new trial.[22]

21. This is not a case in which a defendant was simply told to appear before a named judge without specifying where the defendant was to see the judge. Here, a defendant could reasonably view the return slip as meaning that Judge Queen would at some point be in courtroom 19 on July 18, and that was where the defendant was required to report. We do not understand the government to argue to the contrary.

22. No double jeopardy issue is presented. *See Lockhart v. Nelson,* 488 U.S. 33, 42, 109 S.Ct. 285, 291, 102 L.Ed.2d 265 (1988); *Thomas v. United States,* 557 A.2d 599, 601 (D.C.1989) (en banc).