TURNER v. AMERICAN SECURITY & TRUST COMPANY.

EVIDENCE; OPINIONS; TRIAL; WILLS; REVERSIBLE ERROR; INSANE DELUSIONS; INSTRUCTIONS TO JURY.

1. The fact that lay witnesses, called upon to testify as to their opinions of the mental capacity of the testator, fail to reproduce the minute details of conversation with and incidents concerning the testator, occurring years before they testify, will not of itself render such opinions inadmissible. Such a witness, after stating such particulars as he can remember, is permitted to sum up the total remembered and unremembered impressions of the senses by stating the opinion they produce.

2. No rule can be laid down as to just what class of facts will lay a sufficient foundation to entitle a lay witness to express an opinion as to the mental condition of a testator; but the admissibility of such an opinion must depend mainly upon the circumstances developed by his examination, and is largely within the legal discretion of the trial court, whose ruling will not be disturbed unless it clearly appears that such discretion was improperly exercised.

3. A lay witness who had known a testator for about twenty-five years, and lived near him; who had done painting for the testator and his sister; who had often seen him at intervals not longer than a year apart; who had observed that within five years of his death he would forget one thing and talk about something else; and who had observed, in a conversation he had with the testator shortly before the making of the will and codicils in controversy, concerning the proposed purchase by the witness of a house from the testator, that he did not seem to understand what he was talking about,—is qualified to express an opinion as to the testator's mental competency.

4. The exclusion of the opinion of a lay witness qualified to express an opinion as to the mental competency of a testator cannot properly be assigned as error, where, although the witness was not allowed to express his opinion when asked, there was no specific offer of proof of the opinion, no statement by counsel as to what it was, and nothing in the record to show what it was. (Following *DeForest* v. *United States,* 11 App. D. C. 458.)

5. In a will contest, it is not reversible error for the trial court to exclude the record of a divorce suit between the testator and his wife, offered by the caveator as tending to show that, for thirty years before the making of the will and codicils in controversy, the testator was subject to the insane delusion that his wife was incapable of a valid marriage by reason of a physical malformation, and testimony that, although such was not the fact, the testator had never visited or spoken to his wife during that period; nor to admit in evidence an agreement between them, made about thirty years before his death, whereby each released all interest in the property of the other, after the caveator had been permitted to show an unbroken estrangement of the two from that time.

6. The opinion of the widow of a testator as to her husband's mental capacity, based upon statements of physicians and others, is inadmissible.

7. Where the trial court erroneously permits a witness to be cross-examined upon the contents of a letter, and admits parts of it in evidence, it is a sufficient correction of the error, if the court subsequently instructs the jury that neither the letter nor the use of it allowed on cross-examination is to be taken as evidence of the truth of any of the statements in the letter, or allowed to be used for the purpose of cross-examination.

8. The refusal of a special instruction to the jury is not error, where it appears that the party asking it had the benefit of the evidence to which it related, and also that the instruction segregated some of the facts from others in evidence.

9. The granting of special instructions to the jury is not error, where it is clear, from a consideration of them in connection with the general charge of the court, that they in no way prejudiced the objecting party.

No. 1747.   Submitted March 7, 1907.   Decided May 7, 1907.

HEARING on an appeal by the caveator from a judgment of the Supreme Court of the District of Columbia sitting as a probate court, admitting a will to probate after the trial by jury of issues framed to test its validity.                    *Affirmed.*

The facts are stated in the opinion.

‑ *Mr. Charles F. Carusi* and *Mr. J. J. Darlington* for the appellant. ·

*Mr. William F. Mattingly* and *Mr. Stanton C. Peelle* for the appellees. ·

Mr. Justice McComas delivered the opinion of the Court:

The supreme court of the District, holding a probate court,. admitted to probate and record as the last will of Henry. E. Woodbury a paper dated April 11, 1902, purporting to be his last will, and five codicils thereto, dated respectively January 5, October 30, and December 23, 1903, and February 18, and December 20, 1904. These testamentary papers give his estate, worth about $40,000 in real and personal property, to the Garfield Memorial Hospital and to the Children's Hospital, after · paying $1,000 in small legacies. From the judgment in the., probate court below, Molyneaux L. Turner appealed.

Doctor Henry E. Woodbury, the testator, died January 15, 1905, aged seventy-nine years. His sister, Sally Woodbury, who lived in his home, had died December 18, 1902. He had married about 1870, but in less than two years thereafter his wife and he had separated. They were never divorced, and she survived him. In 1887 they had united in a deed whereby each released all interest in the property of the other.

The testator had been a busy physician until, in 1881, he fell and seriously injured himself, and in consequence of his injuries: retired from practice. During the last twenty-five years of his life he was quite feeble, and devoted his time to the care of several houses he owned, to his investments, and to gratifying his intellectual tastes. He was deaf, and suffered from chronic bronchitis. Four physicians and many other witnesses testified that he was of sound mind and quite competent to make his will. He had no children.

Molyneaux L. Turner, the son of a deceased sister, was his

heir and next of kin. Turner was born in 1870, and graduated in medicine in 1893, and had employment at the Children's Hospital in New York for a year, and then became a physician with the Netherlands Steamship Company, and in 1895, opened an office as a physician in New York, and in the next year abandoned it and came to Washington, where he lived with his uncle, the testator, until August, 1896, when he was appointed on the staff of the Emergency Hospital, where, upon small pay, he remained until September, 1897. In November of that year he became physician to the Panama Canal Company, with a salary of $50 a month. He resigned in the summer of 1898, and soon was appointed volunteer surgeon in the Army, at $150 a month, and resigned his position in June, 1900, only to avoid going to the Philippines. He lived with his father in New York city until February, 1901, when he returned to Washington and lived with the testator, who in June of that year provided him with an office room in a house on 12th street. In August, 1901, Doctor Turner went to live in the home of Mrs. Woodbury, the discarded wife of the testator. There he remained, looking after her property, and especially after the affairs of a mining company in which both were interested. His relations with the testator appear to have been friendly until February, 1904.

After the death of Sally Woodbury, Mena M. Stevens became housekeeper and nurse for the testator. The caveator claims that during the rest of his life she possessed and exercised great influence and control over him, though not as potent as the influence of Sally Woodbury over him during her lifetime. The will was executed during the lifetime of his sister, and all the codicils after her death and while Miss Stevens lived in the house, and there is evidence that she was not kindly toward Doctor Turner.

The will and codicils are in the testator's handwriting. By the will Doctor Woodbury gave his property to his sister for life, and to Doctor Turner $100, a gold watch, and one-fourth interest in a house on 12th street, in Washington. The will mentioned that so much would have been the share of his mother had she lived, and added that the testator's reason for not remembering his nephew more generously was that the nephew by

ingratitude and indifference had forfeited all claim to the testator's consideration, and had embittered the closing years of his life.   To his discarded wife, Anna L. Woodbury, he gave $10, and he made the Washington Home for Incurables the residuary legatee.

On January 5, 1903, he executed the first codicil, in order to fulfil testamentary requests of his sister Sally by making several bequests.   The next codicil, executed October 30, 1903, revoked the clause giving one-fourth interest in the 12th street house to Doctor Turner.   It appears in evidence that in the meantime he had paid Turner $550 for such interest, and the caveator's evidence suggests that the testator drove a shrewd bargain with his nephew.   The third codicil, also numbered two, executed December 21, 1903, is largely a repetition of the last-mentioned codicil, and adds a request to the probate judge for an order to make sure of the destruction of the testator's papers.

It appears that the managers of the Home for Incurables were indifferent to this intended benefactor, and because they ignored his letters the codicil of February 18, 1904, revoked the devise and bequest of the residue of his estate, and gave that residue, after payment of several small bequests, to the Garfield Hospital and the Children's Hospital, each of this District, share and share alike.   The last codicil, executed December 20, 1904, was executed only to substitute the American Security & Trust Company the executor, in place of Mr. and Mrs. Robeson, to assist Miss Stevens in destroying the testator's papers.

The testator told Dr. Sowers, his physician, that he expected his nephew would contest this will.   The testimony shows that Turner and his Aunt Sally became estranged some time before her death, and that Doctor Woodbury, who had been very friendly, but ungenerous, toward his nephew, grew indifferent and finally bitter toward him; and the nephew appears to have attempted to do many things without great success, and the uncle was disappointed in him.   The purpose to leave the bulk of his estate to charity persists in all the testamentary papers, and was unchanged during the last three years of his life.   There is nothing to show that Miss Stevens sought to influence the testator

to give his property to charity. There is much evidence that the nephew failed to conciliate these relatives. The aunt bequeathed to him $100 and this testator gave him the same sum. His uncle and aunt and Miss Stevens each had grown to dislike him. It may have been the nephew was in fault; that he was heedless, ungrateful, inconsiderate. It may have been that his elderly relatives expected more unselfish consideration than their conduct deserved. There is no duty requiring an uncle to give his estate to a nephew, and he may even dislike a nephew without such dislike being an insane delusion.

While the testator disliked Doctor Turner, he liked Miss Stevens, and by deed conveyed to her a house worth $4,000, and transferred to her $2,300 worth of gas stock. She received no salary for two years' care and nursing of an enfeebled old man, who was during the last year confined to his house, often confined to his bed, although he transacted his own business, and at different times purchased stock between the date of the will and his death, attended to his own bank account, and drew many checks upon the trust company which became his executor, and there is evidence of various business transactions by the testator at times and until shortly before his death.

The appellant states nineteen assignments of error. The first eleven of these relate to the same question,—the admissibility of the opinions of lay witnesses respecting the mental capacity of the testator. We need not review the testimony of the seven witnesses for the caveatee, who expressed the opinion that the testator was of sound mind, after having shown more or less acquaintance with the testator and more or less incidents and facts remembered from their acquaintance. Of these witnesses, Mrs. Emma M. Johnson had known the testator twenty years. He had been her attending physician. During the last eight years of his life she had seen him every six months, and during his last illness she had several times called at his house, and saw him there about three weeks before his death. Mrs. Foster Causey had known him all her life; he had been the family physician, and she had been in his home four or five times during the last five years of his life, and there at times he repeated, at

her request, his own verses and other better English verse, and
would sing to her and talk of his home life in New Hampshire.
Mrs. Louisa Thompson met the testator six times during the sum-
mer before his death, and to her he spoke of her father, who
had been an Army surgeon with the testator, and with her he
talked over the times of the Civil War, and also about his home
life in earlier days as having been happy and bright, and re-
marked upon the loneliness of life as he drew near the end of
it. John C. Bardroff was a witness to one of the codicils, and,
beside that, had often carried the rent of a house to the testator,
and had frequently discussed with him the condition of the
testator's property, conversing about each of his houses, and
often talked of other matters, and made social calls upon him,
when they would talk about topics of the day, masonry, and the
accident which had injured the testator years before. Mrs.
Margaret Osmun knew the testator fifteen or twenty years, and
he often called at her house, and she visited him every few
weeks at his home after he became ill. He would talk about
himself, about his sister, and Mrs. Osmun's mother, an invalid
friend of his. They would discuss topics of the day, and he
would speak much about his profession and also about his insur-
ance and his agents, and, though he spoke about money affairs
and about his houses and repairs to them, she could not recall
specific conversations. Reverend E. M. Thompson was rector of
the church of which the testator became a member about two
years before his death, and the witness visited the testator during
the last two summers of his life. Sometimes they discussed his
physical condition, sometimes his literary attainments, at other
times his private affairs. The testator told of papers he had
written and read before medical societies. He recited selections
from his favorite poets, and sometimes regaled the clergyman
with the testator's own verses. Charles J. Shields knew the
testator during the last six years of his life, and for the last
three years had the care of his house on New Jersey avenue. He
had talked with the testator about certain stock and about his
home and repairs to it, and after Shields took the testator's house
to rent he saw the testator two or three times a month, and during

the last six months much more frequently. It was natural for
these witnesses to fail to reproduce the minute details of con-
versations and incidents with Doctor Woodbury. Where wit-
nesses in testamentary contests essay to repeat conversations
years before, such conversations are imagined, not remembered.
Often the meager statement of a witness well acquainted with a
testator is more trustworthy. After the witness has stated
such particulars as he can remember, the ordinary lay witness is
permitted to sum up the total remembered and unremembered
impressions of the senses by stating the opinion they produce.
As the supreme court has said, to allow less may deprive a party
of important and valuable evidence that can be got at in no other
way. The trial judge should permit such testimony with cau-
tion. In the Federal court such evidence is admitted, not only
because of its intrinsic value, but from necessity. The jury and
court did not know the testator ordinarily; and if a witness
knew him during many years, had repeatedly conversed with
him, or had business transactions or spent social hours with him,
or had visited him in sickness or in health, and especially if
the witnesses have no interest in the result of the litigation,
the knowledge which such witnesses possess is knowledge of
which court and jury should not be deprived. It is natural
that such witnesses cannot charge their memories with distinct
independent facts so as to present them in their entirety to the
jury. When such a lay witness has testified to all the facts and
circumstances he can recall, and then is permitted by the trial
judge to give his opinion of the mental soundness or unsound-
ness of the testator, such an opinion may safely be permitted to
go to the jury, for it is the sum of all the circumstances and inci-
dents, and is the impression which the deceased testator's acts
and words have left upon the mind of the witness. "The jury,
being informed as to the witness's opportunities to know all the
circumstances, and of the reasons upon which he rests his state-
ment as to the ultimate general fact of sanity or insanity, are
able to test the accuracy or soundness of the opinion expressed,
and thus, by using the ordinary means for the ascertainment of
truth, reach the ends of substantial justice." See *Connecticut*

*Mut. L. Ins. Co.* v. *Lathrop,* 111 U. S. 612, 621, 28 L. ed. 536, 539, 4 Sup. Ct. Rep. 533; *Queenan* v. *Oklahoma,* 190 U. S. 548, 549, 47 L. ed. 1175, 1177, 23 Sup. Ct. Rep. 762.

The trial judge has the best opportunity to determine whether a lay witness should be permitted to express an opinion as to the mental capacity of a testator in such a controversy as this, and we cannot agree with the appellant that the court below committed error in respect to any of these witnesses, nor can we say that in any instance there was such lack of long and intimate acquaintance with the testator, or such want of opportunity to form a judgment, or such absence of facts on which the opinion of such a nonexpert witness should . be based, that the court below committed reversible error in any of the ten exceptions we have just considered.

It would be impossible to make a rule declaring just what class of facts would show a sufficient foundation for the opinion of a lay witness concerning the mental capacity of a testator. The determination must depend mainly upon the circumstances developed by the examination of each witness, and therefore should be left largely to the wise legal discretion of the trial court; and its ruling in such cases should not be disturbed unless it clearly appears that it did not properly exercise such discretion. See *Denning* v. *Butcher,* 91 Iowa, 430, 59 N. W. 69; *O'Connor* v. *Madison,* 98 Mich. 188, 57 N. W. 105.

For the same reasons we think that the court should have admitted the opinion of the witness Charles Coomb, who had known the testator about twenty-five years, and lived near by; who, being a painter, had worked in the house for the testator and his sister, and who often saw the testator at intervals not longer than a year apart; who had observed, within five years of the testator's death, that he would forget one thing and talk about something else. Coomb had gone, about the year 1901, to talk with the testator about buying from him his house on 12th street, and observed that the testator did not seem to understand what he was talking about. We think this witness was qualified to express an opinion, and had the opinion been offered it would have been

error to have excluded it. But the appellant stopped short of a specific offer of proof of the opinion of the witness Coomb. By the record it appears the witness had an opinion. He was not permitted to state it. Counsel did not state and we cannot assume to know the opinion of a witness.* *De Forest* v. *United States,* 11 App. D. C. 461. It suffices to say that upon the first assignment of error the judgment of the court below should not be reversed.

The twelfth and thirteenth assignments of error relate to the exclusion of the record of the divorce suit between the testator and his discarded wife, and to the admission of an agreement between them of the date of July 1, 1887. During several years after marriage these two lived together, and then Doctor Woodbury separated from his wife, Anna L. Woodbury, and instituted a suit for divorce. The caveator offered the record of this suit to show that, for thirty odd years before his death, Doctor Woodbury was subject to the insane delusion that his wife was incapable of a valid marriage by reason of a physical malformation,—an allegation and belief which was contrary to fact and so shown by the report of physicians appointed by the court to examine her, filed in that suit; and the caveator also offered to

---

*Note.* The record shows that after the witness Coomb had testified to the facts recited in the opinion, the following occurred:

Q. On these different occasions to which you have testified when you saw him, did you form any opinion as to whether he was mentally capable of transacting business?
A. Yes, sir; I had an opinion.
Mr. MATTINGLY: I object to his expressing his opinion.
Mr. DARLINGTON: On what ground?
Mr. MATTINGLY: On the ground that there has not been a sufficient foundation laid.

Whereupon the court sustained the objection, and refused to permit the witness to state his opinion as to whether the testator was mentally capable of transacting business, to which ruling of the court the caveator then and there excepted, which exception the court duly entered upon its minutes.—Reporter.

show that, notwithstanding this serious charge was groundless, Doctor Woodbury had never visited or spoken to his wife during the last thirty odd years of his life. We cannot say that the trial court, in the exercise of its sound discretion, erred in excluding this evidence, which tended to show a delusion affecting Doctor Woodbury more than thirty years before the making of the will and codicils.

Nor do we think the court committed error in admitting the agreement between the testator and his wife, executed July 1, 1887, whereby each released all interest in the property of the other. The caveator had been permitted to show the unbroken estrangement of Doctor Woodbury from his wife during thirty odd years, and this agreement, relating to the separate estate of each of the parties, does not appear so important as counsel would make it. It was a mere detail consequent upon the long and unbroken separation. We cannot say the court committed reversible error in admitting it.

The fourteenth and fifteenth assignments of error are that the court erred in excluding the testimony of Mrs. Anna L. Woodbury explaining her action in executing the agreement just mentioned, upon the ground that she had been advised by physicians and others that her husband was the victim of a mania, and that she must not oppose him in anything, and that she yielded because he wished this paper executed, and that she had executed in November, 1903, along with the testator, a deed to the American Security & Trust Company for like reasons. The two papers executed by Mrs. Woodbury were in evidence. It is assigned as error that she was not permitted to state the reason why she executed these papers, and the reason was her belief that the cograntor was mentally incapable of making a deed. The court below did not prejudice the appellant in excluding such a bad reason; and, since this belief of her husband's mental incapacity rested upon the statements of physicians and others as to her husband's mental condition, the court committed no error in excluding all this hearsay, opinion evidence. Upon no ground could Mrs. Woodbury's testimony here proffered be admissible.

The sixteenth assignment of error presents a. more serious objection.    Upon cross-examination the caveator, Turner, was asked whether he had not addressed profane epithets to his Aunt Sally Woodbury.    He denied having done so, and, when asked, admitted with some qualification that she was a truthful woman. Caveatees' counsel thereupon showed him a letter addressed by her to his uncle, William H. Turner.    He identified this letter as being in her handwriting.    In spite of objection the court permitted the caveator to be cross-examined in respect to the statements in the letter, and also admitted parts of the letter to be read to the jury wherein he was charged with ingratitude, insult, and injury, and the writer said she feared personal harm from him, and that he had used the profane and insulting language about which the caveatees' counsel had asked him.    The court committed grave error in admitting this cross-examination and this evidence; but the court endeavored to correct the error by instructing  the jury that "neither the said letter, nor the use thereof so allowed by the court to be made upon the cross-examination of the caveator, is to be taken as evidence of the truth of any of the said statements in said letter contained or allowed to be used for the purpose of cross-examination as aforesaid."

The general rule is that if evidence which may have been taken in the course of a trial be withdrawn from the consideration of the jury by the direction of the presiding judge, that such correction cures any error which may have been committed by its introduction.  *Pennsylvania Co.* v. *Roy,* 102 U. S. 451, 452, 26 L. ed. 141, 142; *Hopt* v. *Utah,* 120 U. S. 430, 438, 30 L. ed. 708, 711, 7 Sup. Ct. Rep. 614; *Throckmorton* v. *Holt,* 180 U. S. 555, 567, 45 L. ed. 665, 671, 21 Sup. Ct. Rep. 474.    Here the court sought to remove the effect of its error, and clearly pointed out the specific evidence which the court, at the later stage of the trial, withdrew from the consideration of the jury. After careful consideration we are convinced that this judgment should not be reversed upon this ground, and that the court sufficiently corrected its error within the general rule we have just stated.

The seventeenth assignment of error is to the refusal of the court to grant an instruction that the deed from the testator to Miss Stevens was in the nature of a testamentary instrument which might be considered in connection with the manner in which he had disposed of his estate, and also in considering the interest of the witness Stevens in the question involved in this suit. In so far as the caveator was entitled to it, he had the benefit of the evidence to which this instruction related, and the court had the right to refuse the segregation of some facts for this special instruction. Inasmuch as the deed to Miss Stevens and the transfer of the gas stock had been admitted in evidence, the jury necessarily considered the testator's disposition of this part of his estate, and inevitably recalled the interest of Miss Stevens as a witness in the pending controversy.

The eighteenth and nineteenth assignments of error are without merit. The court's own instruction so fully and correctly informed the jury concerning the law relating to insane delusion that the phraseology of the prayer objected to in the eighteenth assignment of error could not have injured the caveator; and for similar reasons the instruction which is the basis of the nineteenth and the last assignment of error, when considered in connection with the court's own instruction, in no wise prejudiced the case of the caveator before the jury.

We would not be justified, because of the minor and inconsiderable errors to which we have adverted, in reversing the judgment, when the record discloses a fair trial and a just and impartial charge by the trial judge, accompanied by a frank and sufficient correction of the only material error we have observed.

The judgment of the court below must be *affirmed, with costs, and it is so ordered.*

On May 16, 1907, the appellant applied for a writ of error or appeal to the Supreme Court of the United States, and on the same day a writ of error was allowed and issued.