**Roland RAY and Janet Ray, Appellants,**

v.

**AMERICAN NATIONAL RED CROSS, Appellee.**

No. 93–CV–759.

District of Columbia Court of Appeals.

Argued March 20, 1995.
Decided Nov. 21, 1996.

Christopher V. Tisi, with whom Michael H. Feldman, Peter J. Vangsnes, and Sidney Schupak, Washington, DC, were on the brief, for appellants.

·Fern P. O'Brian, with whom Peter K. Bleakley and Terri J. Lavi, Washington, DC, were on the brief, for appellee.

Before STEADMAN and RUIZ, Associate Judges, and MACK, Senior Judge.

RUIZ, Associate Judge:

Roland Ray contracted the human immunodeficiency virus (HIV), the virus that causes acquired immune deficiency syndrome (AIDS), through a blood transfusion. The blood was collected in July 1984 by the American National Red Cross. Roland Ray and Janet Ray, who are married, commenced this action to recover damages, alleging that the Red Cross was negligent in failing to take adequate measures to ensure that persons at risk of HIV infection were prevented from donating blood, and that donated blood likely to contain HIV was not used for human transfusion. The jury returned a verdict for the Red Cross, finding that it had not been negligent. The trial court entered judgment on the verdict.

On appeal, the principal issue is whether the instructions given by the trial court adequately conveyed to the jury the essence of the tort of negligence.[1] The Rays also seek review of the trial court's exclusion of evidence concerning subsequent measures taken by the Red Cross to screen prospective donors, subsequent studies that showed screening measures involving direct questions of prospective donors to be feasible and effective, and impeachment of the Red Cross's experts with statements they made after July 1984.

We agree that the instructions did not in substance adequately convey to the jury the law of the District of Columbia regarding negligence—that is, failing to act as a rea-

---

1. The trial court's instructions are set out in Section B *infra*.

sonable person would have acted under the circumstances. Therefore, we reverse and remand the case for further proceedings consistent with this opinion. Because the evidentiary issues are likely to arise in any further proceedings, we address the standards to be applied by the trial court on remand.

## I.

The precise legal issue presented in this case is whether one who performs a service that requires special skill or knowledge must, to avoid liability for harm flowing from her actions, use the same care a reasonable person in the same field would use under the circumstances, or need only do what others who perform similar services would ordinarily do in such circumstances. The Rays contend for the reasonableness standard; the Red Cross urges the ordinary practice standard. To provide a background for our discussion, we first summarize briefly the evidence adduced at trial.

In August 1984, Mr. Ray was shot during a robbery of his convenience store. He was infected with HIV during treatment of the wound as the result of a transfusion of a blood product supplied by the Red Cross. The infected blood was traced to a unit donated in July 1984 by a bisexual man at a blood drive that the Red Cross conducted at his workplace. The evidence showed that Mrs. Ray had not, as of the time of trial, contracted the virus.

At trial, the Rays sought to show that had the Red Cross screened prospective donors by taking greater care to inform them of the groups at risk for HIV infection, confidentially inquiring regarding their sexual history, and providing them with a more confidential method of self-deferral, the donor of the unit of blood that infected Mr. Ray would have deferred and his blood would not have entered the blood supply from which Mr. Ray was transfused. The Rays also attempted to show that, although no test for detecting HIV had yet been developed in 1984, HIV infection was known and had the Red Cross used one or more available "surrogate tests" for other infections or conditions that often accompany HIV infection, the unit of blood

that eventually infected Mr. Ray would not have been used for human transfusion. The Rays' evidence consisted of expert opinion testimony that, based on the knowledge concerning HIV available in July 1984 and the degree of risk posed by the possibility of HIV-infected blood being used for transfusion, a reasonably prudent blood collector would have employed such donor screening and blood testing procedures. The Rays also presented the testimony of the blood donor, who testified that he was semi-illiterate and did not know that he was in a high-risk group. The donor also testified that if he had been informed of the risk to donors and given the opportunity to defer confidentially, he would not have donated blood.

In its defense, the Red Cross established that in July 1984, the vast majority of blood collectors, including the Red Cross, did not use the kind of screening and testing procedures the Rays contended a reasonable blood collector would employ. Furthermore, the Red Cross presented evidence tending to show that its procedures conformed to those recommended by government agencies. The Red Cross also presented testimony that in July 1984, it was thought that implementation of more thorough donor screening procedures would have strenuously been objected to by high risk donors and, consequently, that implementation of more stringent screening procedures would have resulted in lowered blood donations by high risk donors and perhaps even in purposeful contamination of the blood supply by donors offended by the screening procedures.

## II.

### A.

The Rays contend that the Red Cross was obliged to act as a reasonable blood bank, that possessed the knowledge and skill of the Red Cross, would have acted under the circumstances; the Red Cross contends that it had only to act as any ordinary blood bank reasonably would have acted under the circumstances. To support their respective contentions concerning the nature and source of the standard of care applicable in this case, the parties have quoted phrases from

numerous medical malpractice cases from this jurisdiction. *Compare Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) (stating that the standard of care is the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances) *and Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C. 1979) (noting that the standard of care of health care professionals is that degree of care reasonably expected of other medical professionals with similar skills acting under the same or similar circumstances) *with Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 625 (D.C.1986) (approving instruction that defendant's employees were "required to use that degree of care, skill and learning ordinarily possessed by and used by psychiatric nurses acting under the same or similar circumstances") *and Garfield Memorial Hosp. v. Marshall,* 92 U.S.App. D.C. 234, 239, 204 F.2d 721, 725 (1953) ("[T]he duty of a private hospital to give a patient such reasonable care and attention as the patient's known condition requires . . . is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community, and by the express or implied contract with the patient.") *and Rodgers v. Lawson,* 83 U.S.App. D.C. 281, 282, 170 F.2d 157, 158 (1948) ("A physician must exercise that degree of care and skill ordinarily exercised by the profession in his own or similar localities." (internal quotation marks omitted)) *and Sweeney v. Erving,* 35 App. D.C. 57, 61 (1910) ("It is well settled that the degree of skill and learning which a physician or surgeon is required to possess and exercise is that degree of skill and learning ordinarily possessed and exercised by members of his profession in the same line of practice in that locality."). Some cases appear to espouse both standards. *See Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C.1990) (although first stating that the standard of care is "the course of action a reasonably prudent [professional] with the defendant's specialty would have taken under the same or similar circumstances," then saying that the question for the jury was whether "a reasonably prudent tertiary care hospital, at the time . . . and according to national standards" would have acted as the defen-

dant did); *Washington Hosp. Ctr. v. Butler,* 127 U.S.App. D.C. 379, 383, 384 F.2d 331, 335 (1967) (same). In none of those cases, however, did the court consider which standard was appropriate; therefore, the verbal formulations of the standards that were applied in those cases, without dispute and express judicial consideration, do not control our decision. *District of Columbia v. Sierra Club,* 670 A.2d 354, 361 (D.C.1996); *Umana v. Swidler & Berlin, Chartered,* 669 A.2d 717, 720 (D.C.1995); *Murphy v. McCloud,* 650 A.2d 202, 205 (D.C.1994); *see Diamond v. Davis,* 680 A.2d 364, 376 (D.C.1996) (considering on its merits argument for adoption of new rule that would contradict verbal formula repeated in over a dozen cases, where argument had not been considered in earlier cases). Thus, we consider which is the appropriate standard of care in a negligence action.

We begin with the fundamental proposition that in our law of negligence there is but one " 'uniform standard of conduct: that of reasonable care under the circumstances.' " *Sinai v. Polinger Co.,* 498 A.2d 520, 529 (D.C.1985) (quoting *Morrison, supra,* 407 A.2d at 560). We have previously rejected the proposition that a defendant's conformity to ordinary custom and practice is an absolute defense to a claim premised on negligence. In *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195 (D.C.1991), several merchants had extended credit to a person who fraudulently assumed the identity of the plaintiff. *Id.* at 197. The plaintiff, seeking compensation for the resulting damage to his credit rating, sued the merchants, contending that they negligently failed to verify the information in the fraudulent credit applications. *Id.* The merchants sought and obtained summary judgment, supporting their motion with affidavits to the effect that their handling of the applications was consistent with the practice in the industry. *Id.* at 197–98. We held that although the conduct of people possessing or charged with skills and knowledge similar to the defendant's under similar circumstances is *evidence* relevant to establishing how a reasonable and prudent person would act under the circumstances, it is not dispositive on the issue; the fact that

some or most persons who are in a position similar to the defendant fail to act reasonably and prudently does not absolve the defendant of liability. *Id.* at 199.

Although we rejected the merchants' defense of custom and practice, we nevertheless affirmed summary judgment in their favor. The act in question in *Beard*—processing of credit applications—was a matter beyond the ken of the common juror. *Id.* at 200. Hence, the plaintiff was required to present testimony by experts with special skill or training in the area of credit application processing. *Id.* The purpose of the expert testimony is to assist the jury in deciding what would be reasonable under the circumstances. *Id.* at 200–01. We described the sort of expert evidence required of the plaintiff in these terms:

> To determine whether a procedure is reasonable, it would be helpful to secure an informed assessment of its benefits, and also of its cost, which is likely to be passed on to the consumer. We do not think a lay person can be expected to know what kinds of measures would have the potential for detecting applications filed by unauthorized individuals, or how much it would cost the merchant or, ultimately, the merchant's customers to adopt and utilize such measures, or whether any additional detection which more exacting requirements might achieve would be worth the additional costs. There may be other considerations, besides a cost-benefit assessment, which would be pertinent to this analysis; the ordinary citizen may not even know what questions to ask. These are technical subjects on which jurors need expert advice.

*Id.* at 201.

Because the plaintiff in *Beard* had not supplied any such expert evidence, nor rebutted the merchants' evidence regarding custom and practice, we affirmed the grant of summary judgment in favor of the merchants. *Id.* We expressly rejected as being tantamount to strict liability the plaintiff's assertion that the merchants should not be permitted to save the expense of thorough verification of credit applications without also being liable to those third parties, like the plaintiff, who are harmed as the result of fraudulent applications. *Id.* Although we did not explain in *Beard* why we rejected a rule of strict liability for the consequences of each person's acts, the reason is the one articulated by Oliver Wendell Holmes over a century ago:

> A man need not, it is true, do this or that act,—the term *act* implies a choice,—but he must act somehow. Furthermore, the public generally profits by individual activity. As action cannot be avoided, and tends to the public good, there is obviously no policy in throwing the hazard of what is at once desirable and inevitable upon the actor.
>
> ... The state does [not enforce an insurance regime], and the prevailing view is that [government's] cumbrous and expensive machinery ought not to be set in motion unless some clear benefit is to be derived from disturbing the *status quo*. State interference is an evil, where it cannot be shown to be a good. Universal insurance, if desired, can be better and more cheaply accomplished by private enterprise. The undertaking to redistribute losses simply on the ground that they resulted from the defendant's act would not only be open to these objections, but ... to the still graver one of offending the sense of justice. Unless my act is of a nature to threaten others, unless under the circumstances a prudent man would have foreseen the possibility of harm, it is no more justifiable to make me indemnify my neighbor against the consequences, than to make me do the same thing if I had fallen upon him in a fit, or to compel me to insure him against lightning.

OLIVER W. HOLMES, THE COMMON LAW 95–96 (1881).

■ Thus, our modern rule of negligent liability proceeds from a balance struck between an actor's freedom of choice and another's security in person and property: that one whose act unintentionally causes injury to another is generally liable to compensate the other only if the act was not reasonable under the circumstances—that is, only if the act created a foreseeable risk that could have been mitigated at a cost not disproportionate

in light of the gravity and probability of the foreseeable harm. As Holmes suggested, the rule is the result of a balance among many conflicting policies, including those favoring private activity, compensation of persons injured through no fault of their own, and conservation of the government and private resources that must be expended in proceedings to shift losses among individuals. Those considerations and others, however, and therefore the balance struck, may vary with the context of the claim.

■ The Red Cross contends that the context of the Rays' claim is different from that considered in *Beard* because this case involves "professionals." The Red Cross does not offer any definition delimiting the scope of the term, "professional." As a basis for its objection to a standard of care measured by reasonableness instead of the accepted practice of the profession, however, the Red Cross attacks the lay after-the-fact "second-guessing of medical judgments made by the entire medical, scientific and public health communities" that it says would result from allowing in the present case the type of proof we said in *Beard* was permissible. Thus, it appears that for the purpose of the Red Cross's proposed distinction, a professional is one who exercises skill or learning not possessed by persons who do not belong to the same profession.

The Red Cross's objection is ill-founded. *Beard* did in fact concern actions taken by persons with special skill and learning. In *Beard,* we held that the means of preventing jury speculation was not to limit proof of negligence to professional custom and practice, but instead to require the plaintiff to present expert evidence concerning the factors relevant to the setting of the standard of care: those facts and considerations that would be considered by a reasonable person under similar circumstances in deciding upon a course of conduct. 587 A.2d at 199–201. In *Beard,* we considered and rejected the notion that to prevent jury speculation we must preclude the jury from making any decision concerning the proper course of professional conduct, even when the plaintiff provides evidence to inform the jury's determination. We find the *Beard* decision partic-

ularly applicable to this case where the Red Cross is the most significant player in the industry. The Red Cross should be evaluated in the light of its own resources and not by reference to what may be a lower "industry standard" it helped to establish, even if that standard is reasonable in the context of the skills and resources of other participants in the blood banking profession. Thus, the proper standard of care is what a reasonable blood bank with the Red Cross's knowledge and resources would have done under the circumstances. *Morrison, supra,* 407 A.2d at 560 ("[T]he duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes. It is this notion of specialized knowledge and skill which animates the law of professional negligence.").

### B.

■ Having determined the standard of care applicable to this case, we turn to a review of the instructions given to the jury. The purpose of all instructions to the jury is to "guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth." 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2556, at 438 (2d ed.1995). Thus, we have long held that if the trial court's instructions were substantially correct and fulfilled that purpose, we will not reverse merely because the appellant's instruction, although an accurate statement of the law, was not given verbatim. *See, e.g., Mozie v. Sears Roebuck & Co.,* 623 A.2d 607, 612 (D.C.1993); *Weinberg v. Johnson,* 518 A.2d 985, 988 n. 4 (D.C.1986); *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.,* 414 A.2d 834, 841 (D.C.1980); *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 688–89 & n. 3 (D.C.1977). "It is axiomatic that the charge must be read as a whole with the view of determining the impression conveyed thereby to the jury." *Danzansky v. Zimbolist,* 70 U.S.App. D.C. 234, 237, 105 F.2d 457, 460 (1939). Confusing, if not contradictory, jury instructions may rise to the level of reversible error. *Harmon v. Liss,* 116 A.2d 693, 696 (D.C.

1955); *see also Midwest Precision Servs., Inc., v. PTM Indus., Corp.,* 887 F.2d 1128, 1136 (1st Cir.1989) (noting that the principal focus is ensuring that the instructions did not tend to confuse or mislead the jury on the controlling issues). Moreover, jury instructions should not place emphasis on one aspect of the evidence. *Turner v. American Sec. & Trust Co.,* 29 App. D.C. 460, 472 (1907), *aff'd,* 213 U.S. 257, 29 S.Ct. 420, 53 L.Ed. 788 (1909); *Bradford v. National Benefit Ass'n,* 26 App. D.C. 268, 275 (1905); *Bright v. Patton,* 16 D.C. (5 Mackey) 534, 541 (1887).

The Rays requested the following instruction:

A blood bank is negligent if it does an act which a reasonable and prudent blood bank would not do or if it fails to do an act which a reasonable and prudent blood banker would do.

You are instructed that a blood bank which specializes in the collection of blood and the screening of blood donors has a duty to exercise the degree of care that a reasonable and prudent specialist in this field would exercise under the same or similar circumstances.

After presentation of the evidence had been completed, the court heard arguments from counsel regarding jury instructions. The Rays objected to the negligence instruction proposed by the Red Cross insofar as it referred to the care, skill and knowledge "ordinarily possessed and used" by blood bank professionals. The Rays complained that the language suggested that if the Red Cross was doing what was ordinarily done at that time, then it had satisfied the standard of care. The court rejected that objection and appeared to adopt a two-tiered approach to professional negligence: ordinarily, what other professionals are doing establishes the standard of care; however, the plaintiff may show that what a profession is doing as a whole is less than that required by the circumstances.

After giving preliminary instructions, the trial court, apparently extemporaneously,[2] instructed the jury regarding negligence as follows:

Let us turn to this particular case. As I said before, this is—of all medical malpractice actions at bottom, a type of negligence case. And that negligence is defined in the case of a professional, like a blood donor, which requires special knowledge, what is known as the standard of care. And that's what we're talking about, has the Red Cross met its standard of care in the manner I'll describe to you.

Blood collectors, like the Red Cross, have a duty to comply with the standard of care in their profession; that is, we're talking about the standard of care of collecting blood. *The standard of care is defined as follows: They must use that degree of skill, care and learning ordinarily possessed and used by others practicing in their field in the same or similar circumstances.* Thus, as I've indicated to you, in this case, *the term negligence is meant to be—to be defined or is defined really as the failure by the Red Cross to exercise the care, skill and learning ordinarily possessed and used by blood collectors in the same or similar circumstances.* Negligence is not an absolute—it's—in other words, in deciding whether negligence was committed in a given case, the conduct in question must be viewed in light of all the surrounding circumstances at the time the conduct occurred.

You're instructed specifically by me that in order to establish a negligent act or omission on the part of the Red Cross, the *Plaintiffs, Mr. and Mrs. Ray, must prove by a preponderance of the evidence, make it more—show it be [sic] more likely to be so than not so, that the injury complained of was the cause of [sic] doing some particular thing by the Red Cross, that a blood collector of ordinary skill or omission [sic]—ordinary skill would not have done under similar circumstances* or by *the failure of the Red Cross by its omis-*

---

**2.** In response to a request for a copy of the judge's instructions, the trial judge told the jury, "There are no written instructions. I gave you my instructions orally. If you have specific questions about something ... you can write them up and I will consult with counsel and will answer them for you. ..."

*sion [sic] to do some particular thing or things that such a blood collector would have done under the same or similar circumstances.* And the national standard of care in this case for a blood collector is to be judged in the light of the medical and scientific knowledge *in the field of blood banking* as of the time of the blood donation and the blood transfusion into Roland Ray, that is to say the knowledge in the field that people knew or should have known in July of 1984.

*If you find that in collecting and transfusing the blood, the Red Cross used skill, care and learning as was ordinarily possessed and used by blood collectors nationally in the same or similar circumstances in 1984, then the Red Cross was not negligent.* And it's not negligent even in the— of hindsight which judgment may subsequently have shown to be incorrect.

While you may consider prevailing practices, prevailing practice does not necessarily set the standard of care. Prevailing practice may itself be unreasonable or prudent [sic]. What should be done is fixed by a standard of what reasonable and prudent blood banking would do under the same or similar circumstances. Using the standard, you may find if you determine it to be the case that the prevailing practices of the blood banking community who [sic] are unreasonably deficient, if you find that Mr. and Mrs. Ray have shown that the blood banking community failed to institute reasonable measures and effective safeguards to inform form [sic] and to screen high-risk blood donors in 1984.

(Emphases added.)

On the second day of deliberations, the jury sent a note posing the following question: "How do prevailing practices affect the finding of standard of care? Please explain." The Rays proposed that the court repeat only the last part of the earlier instructions, covering prevailing practice. The court refused. Instead, the trial court instructed the jury:

I will try to [explain] that for you. It is not a question that I can answer in one word. The standard of care has been de-fined in the law in this fashion. Give me a moment to make sure I don't misstate it.

*A professional blood banker must use that degree of skill, care, and learning in collecting and transfusing blood that's ordinarily possessed and used by other professional blood bankers in the field in same [sic] or similar circumstances.* That's not a question of law. That's a question of fact. And this is [sic], you should first bear several things in mind. We're talking about practices and knowledge of blood bankers in 1984, not today. Second, you must consider the testimony of expert witnesses in establishing that standard of care. Third, you ought to take into consideration or you should take into consideration what were other responsible professional blood bankers doing in 1984. That's for your consideration. It doesn't necessarily set the standard of care.

You may take into consideration what the Food and Drug Administration regulations required, but those too do not set the standard of care by themselves. And if you find it to be the case, you may determine that the prevailing practice of the entire industry was not necessarily adequate to establish the standard of care *in light of what the industry knew or should have known* about the dangers of blood transfusions in 1984. Please remember, I'm not telling you what you must do. I'm telling you what you must consider.

(Emphases added.)

▮ In all the instructions given by the trial court, only at a single point—during its initial charge, not its "explain[ing]" instruction on the second day—did the trial court accurately state the standard against which the Red Cross's conduct was to be measured: "What should be done is fixed by ... what [a] reasonable and prudent blood bank[ ] would do under the same or similar circumstances." The remainder of the instructions focused the jury's attention almost exclusively on the evidence concerning industry practice. In fact, in its initial charge, the trial court "defined" the standard of care in terms of industry custom and practice.

▮ It is apparent that the initial instructions generated substantial confusion among

the jurors, for they asked for clarification. We may consider such requests from the jury in evaluating for harmless error. *See Jackson v. United States,* 600 A.2d 90, 94 (D.C.1991). In response to the jury's note, the court reinstructed the jury, restating its two-part instruction. In that instruction, however, the trial court did not say that the jury could disregard prevailing practice if it found that the Red Cross failed to act as a reasonable and prudent blood bank would in similar circumstances, as it had in the first instruction; instead, it limited its instruction to "in light of what the industry knew or should have known about the dangers of blood transfusions in 1984." It did not mention the "reasonable and prudent" standard at all. Thus it was insufficient to cure any confusion earlier engendered regarding the correct standard to be applied.

The effect of the trial court's instructions, as the Rays pointed out to the trial court, was to focus the jury's attention on the practices of the whole blood banking industry at the time, instead of the conduct of the Red Cross in light of its circumstances. In an action for negligence, it is the conduct of the defendant that is the central issue, not the conduct of others. Under the instructions given by the trial court, however, the jury had to find that the conduct of the entire blood bank industry was negligent in order to find for the Rays. The scope of such an inquiry is not only nearly impossibly broad for a group of lay jurors to evaluate, but also of marginal relevance to the issue immediately before the court—whether the *Red Cross* was negligent under the circumstances in which *it* acted. Those circumstances were not necessarily identical to the circumstances of the remainder of the industry, nor were the Red Cross's actions necessarily the same. As we noted earlier, particularly where the Red Cross is in a position to substantially establish the industry standard, it may not use that standard as a safe harbor to insulate its activities from scrutiny if competent evidence demonstrates that it would have been reasonable for the Red Cross to adhere to a higher standard or a different practice. Thus, the instructions failed adequately to "guide, direct, and assist [the jury] toward an intelligent understanding of the legal and factual issues involved in their search for truth." WRIGHT & MILLER, *supra,* § 2556, at 438. It was reversible error for the trial court to refuse to give the substance of the instruction requested by the Rays; we remand the case for a new trial.

### III.

The Rays complain of three evidentiary rulings. Because they are likely to arise again on remand, we address them now. The Rays complain that the court improperly excluded evidence concerning (1) subsequent measures taken by the Red Cross to screen prospective donors, (2) subsequent studies that showed screening measures involving direct questions to be feasible and effective, and (3) impeachment of the Red Cross's experts with statements they made after July 1984. The first two matters are logically linked and will be discussed together.

The trial court excluded evidence that after July 1984, the Red Cross began to ask direct questions regarding prospective donors' conduct that placed them at risk of HIV infection, reasoning that they were subsequent remedial measures and that the technical feasibility of asking such questions was not in issue. The Rays contend that the evidence was not inadmissible as a remedial measure, because the Red Cross contended that direct questioning was adopted as a result of information discovered by the industry after 1984. The Rays also argue that the evidence was relevant to show the feasibility of direct questioning of prospective donors, not merely negligence.

■ As in nearly every other jurisdiction, evidence of subsequent remedial measures is not admissible to prove negligence in the District of Columbia. *Avery v. S. Kann Sons Co.,* 67 App. D.C. 217, 219, 91 F.2d 248, 250 (1937); *Altemus v. Talmadge,* 61 App. D.C. 148, 152, 58 F.2d 874, 878 (1932). The reason for the exclusion is two-fold: First, it is thought that permitting such evidence will deter people from making repairs or otherwise altering their conduct following an injury. *See id.* (stating that "the fundamental reason [for the rule is] public policy"). Second, because, as noted above, the question in

every negligence action is whether the defendant was negligent under the circumstances existing at the time of the alleged act or omission, admitting evidence of what the defendant's conduct was *after* the alleged negligent act or omission will "distract the minds of the jury from the real issue and ... create a prejudice against defendant." *Id.* In sum, evidence of a subsequent remedial measure has only marginal relevance, which is outweighed by its potential for undue prejudice both to the alleged tortfeasor and to the public at large.

 In light of the foregoing, the assertions of the Red Cross concerning the reasons for its subsequent adoption of direct questioning have no bearing on whether the evidence should have been excluded as remedial measures to show negligence on the part of the Red Cross. Whether the Red Cross adopted direct questioning as a result of new information or simply because it wished to forestall future litigation is immaterial to the issue of whether it constituted a subsequent remedial measure. Nonetheless, we find that the trial court acted well within its discretion in finding the evidence inadmissible as a remedial measure to show negligence.

With respect to feasibility, however, we think the trial court acted under a misapprehension of law. The Red Cross contended, and the trial court agreed, that because the Red Cross conceded that it knew in 1984 *how* to ask direct questions, and even considered that option, feasibility was not in issue. Feasibility, however, refers not merely to technical possibility, but also to effectiveness. With respect to effectiveness, at trial the Red Cross contended vigorously that use of direct questioning not only would not have resulted in the exclusion of at-risk donors but could have led to revolt among such blood donors, even possibly threatening to taint the blood supply. In light of such arguments, the Rays were entitled to show that when direct questioning was instituted, it was effective at limiting at-risk donors and did not even remotely cause a revolt. In other words, the evidence, although not admissible to show a departure from the standard of care, should have been considered to show the effectiveness of direct questioning and, therefore, that the lack of direct questioning caused the injury to Mr. Ray.

 The trial court also excluded evidence of studies conducted after 1984 that showed that direct questions were both efficacious and did not alienate prospective donors. The trial court excluded the evidence solely on the ground that the studies had been done after 1984 and therefore were not known to the Red Cross at the relevant time. The trial court's analysis was too narrow in this case. First, like the evidence concerning the experience with use of direct questioning, the evidence tended to establish a causal connection between the failure to ask direct questions and the donation of HIV-infected blood.

Second, the Rays proffered the evidence to show that the Red Cross could have discovered the safety and efficacy of direct questioning earlier than it did by commissioning such studies. As the dominant player in the blood banking profession, the Red Cross could have been found to possess sufficient resources to conduct such studies. Contrary to the Red Cross's arguments, it does not appear that the value of the studies depended entirely on the use of a test for HIV, which was not commercially available until 1985. The purpose of a study in 1983 or 1984 would not have been to learn the efficacy of direct questions in excluding HIV-positive persons, but rather to exclude high-risk persons and to dispel the fear held by the blood bank community that such questions would threaten the blood supply. The fact that studies involving direct questioning were subsequently done tends to show that the Red Cross could have learned that direct questioning was possible without risking the blood supply. Similarly, the fact that direct questioning was implemented without mass revolt by prospective donors also suggests that such questioning could have been implemented in 1984. It would, of course, be permissible for the Red Cross to argue that other factors, such as greater public awareness of HIV and AIDS, had a significant effect on prospective donors' willingness to answer questions. That, however, goes to the weight of the evidence and not to its admissibility. By precluding the Rays' prof-

fered evidence, the court effectively prevented the Rays from trying to show both that the fear was factually unfounded, thus demonstrating feasibility, and that the lack of basis for that fear could have been discovered (i.e., known) had the Red Cross undertaken reasonable studies at an earlier time.

Finally, the trial court precluded the Rays from impeaching the Red Cross's experts with published statements they had made after 1984. It did so after the Red Cross asserted that the statements were based on information that could have been acquired only after 1984. It appears from a review of the publications that the Rays sought to use for impeachment that although some statements in them do rest upon knowledge gained from blood tests which only became available after 1984, others do not. Thus, on remand, the trial court should revisit the issue, if necessary.

### Conclusion

■ Because the trial court's instructions were insufficient to guide and direct the jury in its determination of whether the Red Cross was negligent in collecting the blood that infected Mr. Ray, we reverse and remand for a new trial.[3]

*So ordered.*

STEADMAN, Associate Judge, dissenting:

Appellants in their brief summarize their principal argument to us as follows: "The trial court's negligence instruction erroneously equated the standard of reasonable care with the prevailing industry practice."[1]

It is long-established doctrine that "in evaluating the propriety of a court's instruc-

tions, the reviewing court must look upon the charge as a whole without selecting and comparing separate phrases for literal content." *Powell v. United States,* 485 A.2d 596, 601 (D.C.1984). I do not think that, taking into account the totality of the instruction and reinstruction of the trial court, the jury here could have thought that if the American Red Cross's screening practices were the same as those followed generally by professional blood collectors, the American Red Cross had perforce thereby met the requisite standard of care. I see no reason to think that the jury would simply ignore that portion of the instructions which made it quite clear that the prevailing practices of blood collectors did not necessarily set the standard of care, that the ultimate standard was "what reasonable and prudent blood banking would do under the same or similar circumstances," and that it, the jury, could well determine that the prevailing practices were themselves unreasonably deficient and impose liability on that basis.[2] Within this concept, appellants also had full rein to develop their argument of the vulnerability of the American Red Cross in its position as a dominant force in setting those prevailing practices.

In sum, I would conclude that, while not without flaws, the instructions fairly provided a framework within which the jury could assess appellants' theories of liability presented at trial. Accordingly, I respectfully dissent.

---

3. As an alternative ground for affirmance, the Red Cross contends that any error in the instructions was harmless because the evidence was insufficient to establish that although the Red Cross complied with industry practice, it nevertheless acted unreasonably. We find, as did the trial court in denying the Red Cross's motions for judgment as a matter of law, that the evidence adduced by the Rays was sufficient to support a verdict for the Rays on the theory that, notwithstanding industry practice, in light of what the Red Cross knew and should have known in 1984, it was negligent in failing to use more effective donor screening techniques.

1. The American Red Cross argues that in professional fields, the standard of care is indeed that

set by the profession itself, which ought not to subject to second-guessing by a jury even through expert testimony. For present purposes, without reaching the issue, I accept appellants' contrary assertion as presented to the trial court.

2. In reinstructing, the trial court again correctly pointed out that at the very least, the American Red Cross had to meet the prevailing practice by professional blood bankers in the same or similar circumstances. But again, the trial court repeated that this "doesn't necessarily set the standard of care," and made clear to the jury that it could determinate that this practice of the industry was not necessarily adequate.