**Evelyn AIKMAN, Appellant,**

v.

**Louis T. KANDA, et al., Appellees.**

**No. 07–CV–562.**

District of Columbia Court of Appeals.

Argued Nov. 25, 2008.

Decided June 25, 2009.

status changed to Senior Judge on January 23, 2009.

Barry J. Nace, Washington, for appellant.

Alan R. Siciliano, Lanham, MD, for appellees.

Before RUIZ, GLICKMAN and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Appellant Evelyn Aikman appeals from the trial court's denial of her motion for a new trial in her medical malpractice action against Dr. Louis Kanda and his (former) practice group, Cardiovascular & Thoracic Surgery Associates, P.C. We affirm the trial court's ruling.

## I.

In October 2001, Aikman was admitted to the Washington Hospital Center for surgery to repair her mitral valve (the valve between the heart's left atrium and left ventricle). Dr. Kanda, a cardiac surgeon, performed the open-heart operation on October 3, 2001. Following the surgery, Aikman was slow to recover from the anesthesia, and, when she did awaken, she manifested weakness in her extremities. A brain scan performed the day after the surgery revealed that Aikman had suffered an embolic stroke, a stroke that is caused by small particles traveling through the bloodstream to the brain. Aikman was left with permanent physical injuries, including loss of the use of her legs and diminished use of her left hand, and emotional injuries. On September 24, 2004, Aikman sued Dr. Kanda and his professional association, contending that her injuries resulted from air that accumulated in her heart while it was open during the surgery and that traveled to her brain afterwards, and alleging negligence. Specifically, Aikman claimed that Dr. Kanda either failed to employ procedures to remove air from her heart (so-called "air drill" procedures) before completing the surgery, or performed the air drill inadequately.[1]

After the jury returned a verdict in favor of Dr. Kanda on all counts, Aikman filed a motion for a new trial pursuant to Super. Ct. Civ. R. 59. The trial judge, the Honorable Neal Kravitz, denied the motion. *See* Order Den. Pl's Mot. for New Trial, May 1, 2007 ("Order"). This appeal followed.

## II.

In her brief on appeal, Aikman's first argument is that Judge Kravitz erred by giving the jury the so-called "bad result" instruction included in section 9.06 of the Standard Civil Jury Instructions for the District of Columbia, an instruction that the defense requested. Instruction 9.06 states in pertinent part, "A doctor is not negligent simply because his efforts are not successful." Aikman argues that this instruction was confusing to the jury and was "tantamount to a directed verdict" for Dr. Kanda.[2]

1. This was the opinion of Aikman's expert, Dr. Christian Campos, who testified that air was the probable cause of the massive "embolic shower" revealed by Aikman's CT scan. There was no dispute between the parties and their experts that Aikman's neurological injury resulted "from something that happened during the operation." But, in contrast to Dr. Campos, defense expert Dr. John Conte opined that the most likely cause of Aikman's injury was the travel of blood clots or plaque to her brain.

2. Aikman's counsel did not raise a straightforward objection to the instruction at the time the court proposed to give it, telling Judge Kravitz (about Instruction 9.06 and a similar alternative instruction that was under consideration) only that he didn't "have any preference to either one of these bad instructions for the plaintiff." If we were proceeding on a clean slate, we would likely review Aikman's claim only for plain error. However, Judge Kravitz considered Aikman's claim of error with respect to Instruction 9.06 in ruling on Aikman's motion for a new trial, and we therefore go on to review his ruling on that motion for abuse of discretion. *See Wash. Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 168 n. 4 (D.C.1992) (citing authority that denial of motion for new trial is reviewed for abuse of discretion).

In rejecting Aikman's claim, Judge Kravitz reasoned that Instruction 9.06 "was amply supported at trial by expert testimony showing that stroke was a known risk of mitral valve repair surgery, even in the absence of negligence." Order, *supra*, at 8. Judge Kravitz also noted that "the same expert testimony that supported Instruction [9.06] caused the plaintiff to concede toward the end of trial that [her] mid-trial request for an instruction on the doctrine of *res ipsa loquiter* [sic] could not be defended." *Id.* Judge Kravitz's observations accurately reflect the record. Aikman's expert, Dr. Campos, agreed variously that embolic strokes are a "major category of stroke that is seen after heart surgery," that air is a "known risk," and that air emboli are "always a risk in this type of surgery." In addition, during a portion of his pre-trial deposition that was read to the jury, Dr. Campos answered "No" to the question, "Is it[,] in every situation of this type of surgical procedure[,] a violation of the standard of care if a patient winds up with neurological deficit as a result of air to the brain?" Dr. Conte, too, disagreed with the assertion that "if the deairing procedure is done the way it should be done, it's virtually impossible for air to go to the brain." And, during a discussion about jury instructions, Aikman's counsel told the court, "I don't think I could in good conscience" request a *res ipsa loquitur* instruction. He apparently recognized that, in light of the medical testimony, an instruction to the effect that embolic stroke "will not usually occur if due care is used" was not warranted.[3]

Instruction 9.06 reflects a principle established by rulings of this court. *See, e.g., Bunn v. Urban Shelters & Health Care Sys.*, 672 A.2d 1056, 1060 (D.C.1996) ("we cannot imply negligence . . . based solely on the fact that an adverse result occurred") (internal citation and quotation marks omitted). Aikman contends that the instruction made it impossible for her to succeed on her theory of the case, but we do not agree. In the bulk of his testimony, Dr. Campos stressed two major points: (1) that the massiveness and diffuse nature of the embolization shown on Aikman's CT scan convinced him that the cause of Aikman's embolic stroke was not (the inevitable) small amounts of residual air,[4] but instead inadequate de-airing procedures; and (2) that Aikman's records, which evidenced both an absence of any significant atherosclerotic disease and the administration of an anti-clotting drug prior to surgery, undermined the defense suggestion that plaque or blood clots (instead of air) caused her embolic stroke. Judge Kravitz—who had the role of "thirteenth juror"[5] in weighing the evidence and determining whether a new trial was warranted—took the impression that Aikman "presented credible expert testimony in support of her claim of negligence on the part of Dr. Kanda," and that "a reasonable jury could have found in favor of the plaintiff based upon the evidence presented at trial." Order, *supra*, at 10. We discern no basis to disagree with Judge

3. *Giordano v. Sherwood*, 968 A.2d 494, 501 n. 11 (D.C. 2009) (quoting *Harris v. Cafritz Mem. Hosp.*, 364 A.2d 135, 137 (D.C.1976)); *see also Gubbins v. Hurson*, 885 A.2d 269, 282–83 (D.C.2005) (explaining that the trial court may properly refuse a *res ipsa loquitur* instruction when the parties have presented conflicting medical testimony about whether plaintiff's "injury would not have occurred without negligence").

4. The experts agreed that there will always be some residual air left in the heart after open-heart surgery.

5. *Faggins v. Fischer*, 853 A.2d 132, 139 (D.C. 2004) (per curiam) (internal citation omitted).

Kravitz's judgment that, notwithstanding Instruction 9.06 (and the other claimed errors that Aikman cites), the jury could have credited Dr. Campos's theory that Dr. Kanda did not adequately perform the air drill. For all these reasons, we conclude that Judge Kravitz did not abuse his discretion in denying the motion for a new trial on the ground of Aikman's claim of error with respect to Instruction 9.06.

## III.

The background for Aikman's second claim of error is as follows. Pre-trial discovery in the case revealed that there was no contemporaneous notation in Aikman's medical records indicating that Dr. Kanda had performed an air drill before completing the surgery. In addition, by the time the lawsuit was filed, no one on the surgical team could specifically recall the details of Aikman's surgery. Dr. Kanda explained during his deposition and at trial that he performs the air drill "100 percent of the time" as an "integral part" of mitral valve surgery, but he attributed his inability to recall his actions during Aikman's surgery to his having performed over 500 mitral valve operations over the course of his career (with an average of forty or fifty such procedures each year). Defense witness Dr. Steven Goldstein, a cardiologist who assisted during Aikman's surgery as echocardiographer, similarly explained that he had assisted with hundreds of mitral valve operations.

At trial, however, on November 27, 2006, Dr. Goldstein testified for the first time that the transesophageal echocardiogram ("TEE") that he recorded during Aikman's surgery—essentially, a video image of the heart [6]—provides visual proof that Dr. Kanda took action to remove air from Aikman's heart after he had completed the mitral valve repair. Both Drs. Goldstein and Kanda had mentioned the TEE during their pre-trial depositions, but neither had suggested that the TEE could provide evidence that Dr. Kanda performed an air drill maneuver. Looking at the TEE as it was being played for the jury, Dr. Goldstein stated, "That's the surgeon shaking the heart to de-air to get rid of air from the left ventricle."

After Aikman's counsel objected to Dr. Goldstein's surprise testimony, Judge Kravitz instructed the jury to disregard the testimony. Judge Kravitz subsequently ruled that Aikman's counsel would be permitted to conduct mid-trial discovery depositions of Drs. Goldstein and Kanda at defendants' expense, and to present rebuttal testimony from Dr. Campos via *de bene esse* deposition, all on the subject of the TEE and what it showed. Thereafter, during testimony on November 28, 2006, Dr. Kanda was permitted to testify that the TEE showed him "shaking the heart by hand," trying to break up air bubbles so that they could be aspirated. In his *de bene esse* deposition recorded on December 4, 2006, Dr. Campos responded by retracting his theory, which he had expounded during his initial trial testimony, that Dr. Kanda had failed to perform an air drill. Dr. Campos conceded that the shaking shown on the TEE was "one component of . . . the air drill," but opined that "[i]t says nothing about the other components of the air drill or the adequacy of what's being done." He testified that

**6.** The TEE procedure entails passing a probe device down the patient's esophagus to a position behind the heart. Images of the heart can then be taken via ultrasound waves. Prior to and during mitral valve repair surgery, the surgeon can look at real-time TEE images of the heart from a large monitor in the operating room, to assess heart and valve functioning and to determine whether the valve has been adequately repaired. The echocardiographer is able to view the real-time images from a smaller monitor.

"[t]he amount of air that must have traveled to this woman's brain to have resulted in the diffused neurological damage seen on her CAT scan ... indicates to me that the air drill ... was not performed adequately. A properly performed air drill would not result in this degree of air embolization."

Aikman now argues that she was entitled to a new trial because of the prejudice to her case from the jury's hearing, and ultimately being allowed to consider, the surprise expert testimony that the TEE showed Dr. Kanda performing an air drill. Aikman contends that the surprise testimony caused Dr. Campos to lose credibility with the jury, and that the opportunities that Judge Kravitz afforded Aikman for mid-trial discovery did not adequately cure the prejudice. Aikman emphasizes (1) that having previously told the jury that he assumed that no air drill had been performed, Dr. Campos was forced to qualify his opinion; and (2) that Dr. Campos was forced to acknowledge that, although he had viewed the TEE before giving his initial testimony, he did not equate the shaking with an air drill being performed.

In essence, the issue that Aikman raises is whether Judge Kravitz abused his discretion by not excluding the TEE testimony entirely, as a discovery sanction. Judge Kravitz agreed with Aikman that the defense committed a sanctionable discovery violation when it failed to disclose prior to trial, pursuant to Super. Ct. Civ. R. 26(b)(4) ("Experts") and Super. Ct. Civ. R. 26(f) ("Supplementation of responses"), that Drs. Goldstein and Kanda—both of whom had been designated as fact witnesses only—would offer expert testimony that the TEE showed an air drill being performed. Relying on this court's decision in *Gubbins, supra* note 3, Judge Kravitz reasoned that each physician's testimony was expert (rather than fact) testimony, which should have been disclosed prior to trial, because, in each case, the testimony was not based on the physician's recollection of the air drill itself or on a recollection of having watched the TEE screen during Aikman's surgery and having formed an opinion then about what it showed. Rather, the testimony was based on each physician's viewing and interpretation of the TEE in preparation for and during trial. *Cf. Gubbins, supra* note 3, 885 A.2d at 275 (where defendant treating physician had not been designated as an expert, court should have sustained objection to presentation of the physician's opinion that had been reached in anticipation of litigation or trial, not in the course of treating the plaintiff).

In determining what sanction was appropriate for the defense's discovery violation, Judge Kravitz weighed the factors that this court outlined in *Weiner v. Kneller,* 557 A.2d 1306 (D.C.1989). In *Weiner,* we held that the following factors are relevant "in deciding whether to allow expert testimony improperly left off a Rule 26(b)(4) statement:" whether allowing the evidence would incurably surprise or prejudice the opposite party; whether excluding the evidence would incurably prejudice its proponent; whether the proponent willfully failed to comply with the rules; the impact of allowing the testimony on the orderliness and efficiency of the trial; and the impact of excluding the testimony on the completeness of information before the finder of fact. *Id.* at 1311–12; *see also Townsend v. Donaldson,* 933 A.2d 282, 290–91 (D.C.2007). Considering each of those factors, Judge Kravitz found that the TEE was a "highly reliable piece of evidence," that it was "in the interest of the search for truth" to have both parties present expert testimony as to what the shaking on the TEE showed, and that exclusion of the TEE would be prejudicial

to defendants. Additionally, he found no "evidence of any bad faith or any effort on the defendants['] part to mislead the plaintiff." However, he also found that there could be, from admission of the TEE testimony, incurable prejudice to Aikman's theory that Dr. Kanda performed no air drill procedure at all, and that the orderliness and efficiency of the trial could be impacted if the court were to give Aikman an opportunity to retain a new expert to evaluate the TEE. The latter two points led Judge Kravitz to conclude initially that the relevant factors weighed in favor of exclusion of the TEE testimony. Ultimately, however, after allowing the mid-trial discovery already described and hearing more from the parties and their witnesses, Judge Kravitz resolved the issue by allowing the jury to consider Dr. Kanda's expert testimony that the TEE showed him shaking the heart as a de-airing procedure.

In his order denying Aikman's motion for a new trial, Judge Kravitz explained his reasoning that any prejudice to Aikman from the TEE testimony was adequately addressed by what transpired at trial after the court's initial weighing of the *Weiner* factors. Judge Kravitz noted, for example, that during his rebuttal testimony, Dr. Campos testified that the TEE "reinforced his opinion that Dr. Kanda failed to perform adequate de-airing procedures." Order at 4. More specifically, the record shows, Dr. Campos utilized the opportunity to look at the TEE again in light of the defense testimony to point out that Dr. Kanda shook Aikman's heart for only twenty-seven seconds, a duration that Dr. Campos opined "does not represent adequate performance of the so called air drill." Dr. Campos also took advantage of the TEE to point out that air bubbles shown on the recording could still be seen even after the shaking ceased, and he opined that "[t]he fact that the heart continues to pump air throughout this process ... indicates to me that the air drill was not performed adequately."

Having initially considered the *Weiner* factors and found several that weighed in favor of allowing the TEE testimony, and having thereafter recognized that the TEE enabled Aikman to obtain additional testimony favorable to her case, Judge Kravitz reasonably concluded that the factors that weighed in favor of excluding the TEE testimony no longer were predominant. *See Weiner, supra,* 557 A.2d at 1311 (explaining that a preponderance of the prescribed factors must be satisfied before expert testimony omitted from a Rule 26(b)(4) statement may be allowed). Judge Kravitz also reasonably relied on the fact that Aikman "never requested a mistrial or a mid-trial continuance to prepare further to meet the force of the proffered opinion testimony." Order at 4. Accordingly, we discern no abuse of discretion in Judge Kravitz's determinations not to impose the "severe sanction"[7] of exclusion of evidence, to allow Dr. Kanda's TEE testimony, and to deny the motion for a new trial.[8]

---

7. *Weiner, supra,* 557 A.2d at 1310 n. 5.

8. We also think that Aikman may well overstate the prejudice to her case from the retraction that Dr. Campos was forced to make in light of the defense testimony about what the TEE showed. Dr. Campos had acknowledged during his initial testimony that he considered himself a non-expert in reading TEEs and his consistent testimony was that the cause of Aikman's injuries was *either* Dr. Kanda's failure to perform an air drill or his inadequate performance of the air drill.

Similarly, we think Aikman overstates the evidence of bad faith. Aikman argues that, during their pre-trial depositions, Drs. Goldstein and Kanda withheld information about what could be gleaned from the TEE. For example, Aikman notes that, in deposing Dr. Goldstein, her counsel pressed Dr. Goldstein to disclose "anything else about this lady that

Aikman asserts an additional claim of error relating to the TEE testimony. Although Judge Kravitz struck Dr. Goldstein's testimony that the TEE showed shaking for the purpose of de-airing the heart, as his testimony continued, Dr. Goldstein blurted a similar comment again ("This is shaking which is de-airing of the heart"), and also made numerous references to the TEE showing Dr. Kanda "doing something I'm not allowed to mention happen[ed]." Aikman argues that she was highly prejudiced by these statements (to which she asserts she could not continually object without leaving the jury with the impression that she was frightened of Dr. Goldstein's testimony). As Judge Kravitz ruled, however, Dr. Goldstein's testimony about the TEE was cumulative of Dr. Kanda's testimony on the same point. Order at 5. As we have determined, Judge Kravitz did not abuse his discretion in allowing Dr. Kanda's testimony that the TEE showed a de-airing procedure being done. That the jury heard Dr. Goldstein's statements to the same effect is not ground for a new trial.

## IV.

Aikman next argues that defense expert Dr. Conte, a board-certified cardiothoracic surgeon at Johns Hopkins, should not have been permitted to testify because his deposition testimony showed that he did not have an understanding of the applicable (national) standard of care

or a basis for opining that Dr. Kanda complied with that standard.[9] The premise of Aikman's argument is that, during his pre-trial deposition, Dr. Conte agreed that "as long as the doctor reviews the diagnostic tests and performs the surgery in a manner he has experience with and will take care of the pathology, he's followed the standard of care" and that "anything that a surgeon doing this kind of operation ... does is within the standard of care if he doesn't knowingly do a poor job." Although agreeing that these and other statements by Dr. Conte made it a "close question" as to whether Dr. Conte could qualify as a standard-of-care expert, Judge Kravitz concluded after extensive voir dire questioning that Dr. Conte would be permitted to testify about Dr. Kanda's compliance with the standard of care.

As Judge Kravitz explained at length in announcing his ruling on the issue and in denying the motion for a new trial, Dr. Conte's answers during voir dire established that he received "extensive training in de-airing procedures in several different states in different regions of the country" and had worked and had "contacts with other cardio-thoracic surgeons in different locations throughout the country." Order at 6. Judge Kravitz also "carefully considered Dr. Conte's voir dire testimony." Id. Judge Kravitz reasoned that Dr. Conte's "prior inconsistent statements about the standard of care made during his pretrial

you haven't told me about? Anything at all?" The context shows, however, that the deposition questioning focused on whether Aikman's records showed plaque or atherosclerosis. We think a fair reading of the depositions is that neither Dr. Goldstein, who had seen the TEE over a year before his deposition and remembered it only vaguely, nor Dr. Kanda, who had not seen the recording at the time of his deposition, was asked any question that clearly should have triggered testimony that the TEE showed shaking that was part of the air

drill. Thus, Judge Kravitz was not bound to accept Aikman's argument that the doctors' trial testimony was "in contradiction of" their deposition testimony.

9. This Court has repeatedly held that "an expert in a medical malpractice case must establish the basis for his knowledge of the applicable national standard of care and link his opinion testimony to the applicable national standard." Hill v. Medlantic Health Care Group, 933 A.2d 314, 325 (D.C.2007).

discovery deposition were relevant" to his "credibility as a witness and ultimately to the weight to be accorded to his opinions, but that the prior inconsistent statements did not require" that he be precluded from testifying about the standard of care. Order at 7. Finally, Judge Kravitz reasoned that "Dr. Conte's trial testimony on the national standard of care was not materially at odds with" the testimony of Aikman's expert, Dr. Campos. *Id.* This point persuaded the court that any error in allowing Dr. Conte's standard-of-care testimony was harmless. *Id.*

▮▮▮ "[E]xpert testimony, regardless of by whom offered, must meet basic standards of competency and relevancy, and [a] grounded reference to a national standard is a requisite for any opinion regarding standard of care in a medical malpractice case." *Hawes v. Chua,* 769 A.2d 797, 806 (D.C.2001). Nevertheless, while a "decision that the expert testimony presented by the plaintiff was (or was not) sufficient to meet her burden of proof is a question ultimately of law that we decide *de novo,*" we "review the admission of a defense expert's medical opinion deferentially." We discern no abuse of discretion in Judge Kravitz's decision permitting defense expert Dr. Conte to offer standard-of-care testimony.

First, the record amply supports Judge Kravitz's reasoning that Dr. Conte's training and experience rendered him competent to render national standard-of-care testimony. Dr. Conte testified that he trained under surgeons who themselves had trained nationally; that his training included observation and supervision, during his residencies at Georgetown and Stanford, on how to remove air from a heart after open-heart surgery; that he "train[s] people nationwide"; that he served as the head of the council on education of the Society of Thoracic Surgeons (the board that certifies cardiac and thoracic surgeons) and was in charge of that body's annual educational meetings; that he was an examiner and wrote examination questions for the American Board of Thoracic Surgery; and that he had published approximately 100 peer-reviewed journal articles, 30 or 40 book chapters, and also electronic papers that appear on a website for cardiothoracic surgeons. Thus, Dr. Conte referenced "conferences ..., scholarly literature ..., and national surgical society meeting[s] as resources establishing that his testimony was not based on personal opinion but a national standard." *Strickland v. Pinder,* 899 A.2d 770, 774 n. 2 (D.C.2006).

▮▮▮ Second, during his *voir dire* testimony, Dr. Conte stated that the standard of care is what a "reasonable and competent cardiothoracic surgeon" "would do under similar circumstances," and, when questioned by the court about how he knew which air drill methods complied with the standard of care, he answered that he knew by reference to what is done "nationwide" in the field of cardiothoracic surgery.[10] Dr. Conte's answers were consistent with the focus described in our case law. *See, e.g., Hawes, supra,* 769 A.2d at 806 ("the standard of care focuses on the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances") (citation and internal quotations omitted). Third, as we reasoned in *Townsend,* a trial court may reasonably judge that impeachment during

10. Aikman emphasizes that Dr. Conte "had never been to a conference or seminar where the performance of an air drill was discussed." However, the record gives us no reason to question Dr. Conte's testimony that air drill is "so basic, there aren't any courses...."

cross-examination, rather than exclusion of competent trial testimony, is a sufficient response to inconsistencies between an expert's trial and deposition testimony about the standard of care.[11] *See Townsend, supra,* 933 A.2d at 295 ("Dr. Townsend was able to use Dr. Bechamp's inconsistent testimony from his discovery deposition to impeach him at the *de bene esse* deposition, mitigating any prejudicial effect the change in testimony may have had").

Finally, Judge Kravitz's observation that the parties' experts substantially agreed during their trial about what the standard of care required is borne out by the record. Just as Dr. Campos had done, Dr. Conte testified that the standard of care requires "that the surgeon make an effort to remove any air ... remaining in the heart." Dr. Conte also described various air drill procedures that corresponded closely to the maneuvers described by Dr. Campos.[12] And while Dr. Conte endorsed the air drill methods that Dr. Kanda described, on this point Dr. Conte's testimony differed little from the testimony of Dr. Campos. Dr. Campos likewise agreed that Dr. Kanda's account of how he routinely performs the air drill described a "perfectly reasonable" and proper method that would comply with the standard of care if actually performed.

■ Thus, as Aikman's counsel acknowledged, the critical issue in this case was whether Dr. Kanda actually followed the recognized air drill procedures in an effort to remove as much air as possible from Aikman's heart, not what those procedures

were or whether the standard of care required such effort. Dr. Conte explicitly acknowledged that he had no direct knowledge, but was simply assuming that, in Aikman's case, Dr. Kanda followed the air drill procedures that Dr. Kanda had described during his deposition. In light of these facts, it was reasonable for Judge Kravitz to conclude that no miscarriage of justice resulted from allowing Dr. Conte's testimony that Dr. Kanda complied with the standard of care, even assuming that Dr. Conte's deposition and *voir dire* testimony did not qualify him to testify about the standard of care. *See Faggins, supra* note 5, 853 A.2d at 140 ("the trial court has the power and the duty to grant a new trial ... if for any reason or combination of reasons justice would miscarry if the verdict were allowed to stand") (internal citation, quotation marks, and other punctuation omitted).

## IV.

Over objections by Aikman's counsel, Dr. Kanda testified about the air drill procedures that he routinely performs after completing a mitral valve repair. Aikman's final contention on appeal is that Judge Kravitz erred in permitting Dr. Kanda to do so, entitling Aikman to reversal of the judgment and a new trial. Aikman's argument is actually twofold. First, she contends that Dr. Kanda's testimony about his routine practice of air removal following open-heart surgery amounted to inadmissible character testimony (*i.e.*, testimony that Dr. Kanda's character was to

---

11. In this case, the jury had an opportunity to weigh the credibility of Dr. Conte's explanation that his deposition testimony reflected his feeling "frustrated," "harassed," "very uncomfortable" and "under duress" during deposition questioning by Aikman's counsel.

12. The parties' experts and Dr. Kanda agreed that the components of an air drill include

venting the heart with a tube or catheter and tilting the patient so that the heart is on a higher plane than the head, causing air to rise in the heart and escape through the vent; massaging or jiggling the heart so as to dislodge air from walls and pockets within the heart; and inserting a needle into the apex of the heart and aspirating accumulated air.

be careful), rather than habit testimony. Second, Aikman argues that even if Dr. Kanda's testimony could fairly be regarded as habit testimony, habit testimony should not be allowed in a medical negligence action. For the reasons that follow, we reject both arguments.

Habit evidence "denotes a person's regular response to a repeated situation to the point where 'the doing of the habitual act may become *semi-automatic. . . .*'" *Smith v. United States,* 583 A.2d 975, 980 n. 9 (D.C.1990) (quoting McCORMICK ON EVIDENCE § 195 at 575 (3d ed.1984)) (emphasis in *Smith*). The proponent of habit evidence bears the burden of "proffer[ing] instances sufficient in number to warrant a finding that the habit or routine existed in fact." *Id.* at 980 (quoting *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 511–12 (4th Cir.1977)), *superseded on other grounds, cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978) ("[w]hile precise standards for measuring the 'extent to which instances must be multiplied and consistency of behavior maintained in order to support an inference of habit or pattern of conduct cannot be formulated,' it is obvious that no finding [of habit] is supportable . . . which fails to examine critically the 'ratio of reactions to situations' "). The "offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." *Smith,* 583

A.2d at 981 (quoting *Simplex Inc. v. Diversified Energy Sys., Inc.,* 847 F.2d 1290, 1293 (7th Cir.1988)).

Aikman contends that Dr. Kanda's testimony was not habit testimony because the performance of a complex surgical procedure is not "semi-automatic in nature." However, as Judge Kravitz explained in denying Aikman's motion for a new trial, Dr. Kanda established that he had performed more than 500 mitral valve operations, Order at 5, and he testified that the air drill "is an integral part of the procedure. So, I do it every time." In addition, Dr. Kanda described his air drill routine step by step, and in great detail, and described his specific responses to various triggers and developments that occur over the course of the procedure.[13] Given Dr. Kanda's very specific testimony, we cannot agree that Dr. Kanda's account amounted to character evidence rather than habit evidence. "[C]haracter evidence is a generalized description of a person's disposition. . . . Habit evidence, on the other hand, is more specific because it denotes a person's regular response to a repeated situation. . . ." *Smith, supra,* 583 A.2d at 980. In addition, in light of the high ("100 percent") "ratio of reactions to situations" that Dr. Kanda described and the specificity of his account of his routine, we cannot conclude that Judge Kravitz erred in determining that, for Dr. Kanda, the air drill was semi-automatic in nature.

Aikman also argues that a complex surgical procedure "cannot be so free from

---

**13.** Dr. Kanda testified, *e.g.,* "as the heart was filled with blood you would squeeze it"; "as you do that, of course, the blood is going to . . . fill up this space, which probably still has some air in there. And because you have this cannula here that will force that air through that cannula;" "So during this period of time where we try to get as much air out of the heart as possible. Since it's not ejecting itself we have to help it by sucking through this cannula or lifting the heart and sticking a needle in the apex of the heart which is here and squeeze the heart;" "Once I'm comfortable that all the air or most of the air is out . . ., then I tell the perfusionist to start coming off the heart lung machine . . .;" "By this time I should mention that we have called the cardiographer . . . and [h]e would look for any residual air that's still in the heart."

volition as to regard it as habit." Judge Kravitz reasoned that "[t]he volitional aspect of the de-airing procedures ... went to the weight of the evidence of Dr. Kanda's habit but did not require its exclusion." Order at 6. Judge Kravitz's analysis on this point is consistent with this court's observation that the volitional nature of habitual conduct is relevant to its probative force, not its admissibility. *See Smith, supra,* 583 A.2d at 982 ("the probative force of habit evidence is in inverse proportion to the extent the habit involves volitional activity") (internal citation and punctuation omitted).

 Judge Kravitz reasonably determined that the defense satisfied the foundational requirements for the admission of Dr. Kanda's testimony as habit evidence. That does not end the analysis, however, because, as we recognized in *Smith,* "courts should be cautious in permitting admission of habit or pattern of conduct evidence" because of the "danger that it may afford a basis for improper inferences, cause confusion, or operate un-

fairly to prejudice a party."[14] *Smith,* 583 A.2d at 980 (quoting *Wilson, supra,* 561 F.2d at 511). Here, we are satisfied that Judge Kravitz took steps to assure that the jury would not be confused by Dr. Kanda's testimony. Before Dr. Kanda responded to defense counsel's request that he "take the ladies and gentlemen of the jury through a mitral valve procedure," Judge Kravitz interjected that the response should describe "not specifically what you did when you were operating on the plaintiff [regarding which Dr. Kanda had just testified that he had no specific recollection], but I think what he's asking you is what is your routine in terms of performing a mitral valve repair surgery. Do you understand that?"

Finally, we discern no reason why, as a general rule, habit evidence should be any less admissible in medical negligence actions than in other types of cases. Courts in many jurisdictions have allowed evidence of a medical practitioner's routine practice as evidence relevant to what the practitioner did on a particular occasion.[15]

14. Accordingly, " 'habit or pattern of conduct' is never to be lightly established," and purported habit evidence "is to be carefully scrutinized before admission." *Smith, supra,* 583 A.2d at 981 (quoting *Loughan v. Firestone Tire & Rubber Co.,* 749 F.2d 1519, 1524 (11th Cir.1985)) (further citation omitted).

15. *See, e.g., Rivera v. Anilesh,* 8 N.Y.3d 627, 838 N.Y.S.2d 478, 869 N.E.2d 654, 657–58 (2007) (holding that the record supported the admissibility of the dentist's "deliberate and repetitive practice" with respect to administering injections of anesthesia, in light of the testimony indicating that the dentist "performed this procedure in the same manner thousands of times," and because there was "no evidence suggesting that [the dentist's] pre-extraction injection procedure would vary from patient to patient depending on the particular medical circumstances or physical condition of the patient"); *Hoffart v. Hodge,* 9 Neb.App. 161, 609 N.W.2d 397, 404 (2000) (recognizing that while physician's testimony

about his routine of advising his patients about mammogram failure rates was self-serving, that fact went to the weight and credibility of the testimony rather than its admissibility, and observing that for a physician who has treated thousands of patients, "substantially decreas[ing] the likelihood that the doctor will recall a specific conversation with a specific patient," evidence of habit "may be the only vehicle available for a doctor to prove that he or she acted in a particular way on a particular occasion"); *Palinkas v. Bennett,* 416 Mass. 273, 620 N.E.2d 775 (1993) (holding that the trial court did not abuse its discretion when it allowed defendant pediatrician to testify that he invariably followed the same routine when he discharged premature infants throughout decades of practice, during which he had discharged hundreds of such infants).

*See also Reaves v. Mandell,* 209 N.J.Super. 465, 507 A.2d 807 (1986) (holding that defendant doctor, who could not recall the specifics of any conversation he had with the plaintiff,

As some courts have reasoned, habit evidence may not be properly admissible where the physician's routine varies according to the condition of the patient.[16] But, as we read the testimony in this case, the air drill procedures that Dr. Kanda described as part of his routine are proper during any mitral valve repair operation. It was not error to allow the jury to hear his account of his routine during mitral valve surgery. The jury could still have discredited Dr. Kanda's testimony that he performed his air drill routine "100 percent" of the time, including in Aikman's case.

For the foregoing reasons, we affirm the judgment of the trial court and the order denying the motion for a new trial.

*So ordered.*

was properly allowed to testify about the specific information which he said he invariably gave over his fifteen years of practice to patients with fibroid uterus, the condition for which he treated plaintiff); *McCormack v. Lindberg,* 352 N.W.2d 30, 35 (Minn.Ct.App. 1984) ("as long as it is clear that Dr. Lindberg is not testifying specifically about an operation he cannot remember, he should be allowed to tell the jury how he usually performs a first rib resection"); *Bloskas v. Murray,* 646 P.2d 907 (Colo.1982) (holding that evidence of a doctor's habit of routinely advising patients about to undergo hip or knee replacement surgery of the risks of infection was admissible as circumstantial evidence to show that he had given the same advice to the plaintiff, even though he had no independent recollection of ever so advising the plaintiff); *Dincau v. Tamayose,* 131 Cal.App.3d 780, 182 Cal.Rptr. 855, 863–64 (1982) ("[e]vidence of custom may be introduced to show that it was unlikely that a defendant was negligent on a particular occasion" because, otherwise,

"[w]hat protection would any doctor have, years after an event, other than a vigorous denial that the event did or could have taken place, together with perhaps a lack of recollection"); *Meyer v. United States,* 464 F.Supp. 317, 321 (D.Colo.1979) (allowing evidence that dentist routinely and regularly informed dental patients of the potential risks involved in extraction of third molars), *aff'd,* 638 F.2d 155 (10th Cir.1980).

16. *See, e.g., Vuletich v. Bolgla,* 85 Ill.App.3d 810, 41 Ill.Dec. 68, 407 N.E.2d 566, 571 (1980) ("Dr. Bolgla's usual procedure in monitoring a patient's respiration when intubation is used may have differed from his procedure when the tube is placed in the patient's nose as was done here. If so, the normal procedure in that situation would be irrelevant to the instant surgery and Nurse Foxworth's testimony should have been excluded, since it did not appear that the witness was describing Dr. Bolgla's procedure under identical circumstances").