**Frank KORDAS, et al., Appellants,**

v.

**Paul H. SUGARBAKER, Appellee.**

**No. 07–CV–1309.**

District of Columbia Court of Appeals.

Argued Feb. 16, 2010.
Decided March 11, 2010.

---

Barry J. Nace, with whom Christopher T. Nace, was on the brief, for appellants.

Steven A. Hamilton, with whom Karen S. Karlin, Bethesda, MD, was on the brief, for appellee.

Before RUIZ, GLICKMAN, and THOMPSON, Associate Judges.

RUIZ, Associate Judge:

Appellants, Frank and Marilyn Kordas, sued Dr. Paul H. Sugarbaker for medical malpractice, alleging that he breached the national standard of care when he performed a "second look" surgery on Mr. Kordas. On appeal, appellants argue that the trial court erred in (1) giving the "bad result" instruction and (2) admitting the expert witnesses on behalf of Dr. Sugarbaker because their testimony did not address the national standard of care. We disagree with both contentions and affirm.

## I. FACTS

In July of 2002, Mr. Kordas had a colonoscopy, which was negative, but a CT

Scan showed fluid collected and a mass attached to the dome of his bladder. On September 3, 2002, Mr. Kordas underwent a procedure in Phoenix, Arizona, to remove the mass, which was diagnosed as appendiceal carcinoma, a rare form of cancer. In the course of the operation, a tumor wall was breached and mucinous cancerous material was released into the surrounding area in the abdominal cavity. An oncologist in Arizona recommended extensive chemotherapy and radiation treatments.

Appellants sought assistance to see what else could be done to assure the long-term survival of Mr. Kordas. On December 16, 2002, appellants had a consultation with Dr. Sugarbaker in Washington, D.C. During the consultation, Dr. Sugarbaker recommended "a second look surgery." Dr. Sugarbaker explained that "[w]e would open the abdomen to a wide incision. We would perform a[n] ... excision of any areas where there is [a] visible tumor within the abdomen and it is possible that a repeat excision of a portion of the bladder would be necessary. It is also possible that a re-excision of the colon may be necessary." Dr. Sugarbaker noted that "[i]f indeed this is a negative abdominal exploration the patient would be out of the hospital within about seven days and we would think that his prognosis is good."

Mr. Kordas returned to Washington and had the second look surgery with Dr. Sugarbaker on April 1, 2003. During a conversation that took place with Mrs. Kordas while the surgical procedure was ongoing, Dr. Sugarbaker reported what he had found:

> He's got millions of nodules, all very, very tiny. Millions. They are just all over the place but they are, as is usually the case, greatest quantity on the colon
> . . .

Based on Dr. Sugarbaker's observations of what he believed to be evidence of widespread cancerous cells in the abdominal cavity, he proceeded to remove the entire colon, mesentery, omentum, and other tissue in the affected area. The abdominal cavity was then bathed with chemical ingredients. A few days after the procedure, appellants were advised that numerous tissue samples that had been sent to the laboratory revealed that cancer was not present. It was later determined that the "cancer" was a fungus, which is indigenous to the Phoenix, Arizona desert area where Mr. Kordas lived.

At the trial, appellants offered the expert testimony of Paul Goldfarb, M.D., who was qualified by the court as an expert in general surgery and surgical oncology. Dr. Goldfarb testified that the national standard of care required Dr. Sugarbaker to suspend the surgery and conduct a frozen section biopsy to determine what the nodules were before removing important organs from Dr. Kordas's body. Dr. Leff, who had performed the initial surgery in Phoenix and is a general surgeon, testified to the same effect.

Dr. Sugarbaker offered expert testimony by Dr. Samuel Corlin Bieligk and Dr. Robert Sticca. The defense experts testified that the standard of care required of a physician treating a patient who has been diagnosed with appendiceal cancer does not call for a frozen section biopsy to be performed during a "second look" operation. Dr. Bieligk explained that when dealing with rare mucinous cancers like Mr. Kordas had,

> the ability to do [a] frozen section on all of these nodules is very limited and, in fact, unreliable because some, but not all, of the tissues might be cancerous. The problem is which nodules do you take.... The risk is missing cancer.

That's the real risk because the problem is if you leave cancer there we know from experience that that will recur.

The jury returned a verdict for Dr. Sugarbaker after finding that plaintiffs had not proven by a preponderance of the evidence that Dr. Sugarbaker had departed from the national standard of care by "failing to confirm the presence of cancer before proceeding" or "failing to know what he was dealing with before embarking on the operation."

## II. ANALYSIS

### A. *Civil Jury Instruction* 9.06 (*"bad result"*)

We can summarily dispose of appellants' contention that Civil Jury Instruction 9.06 (the "bad result" instruction[1]) should not have been given because it is "only appropriate when a plaintiff brings a medical negligence claim for failure to perform a guarantee...." Recently, in *Gubbins v. Hurson*, 987 A.2d 466, 2010 WL 183422, at *2 (Jan. 21, 2010 D.C.), we held that the bad result instruction generally may be given in medical negligence cases. In *Aikman v. Kanda*, 975 A.2d 152 (D.C.2009), we rejected the related argument made by appellant that the instruction is tantamount to directing a verdict for the defendant, noting that "Instruction 9.06 reflects a principle established by rulings of this court." *Id.* at 156.

### B. *Expert Testimony*

■ Appellants challenge the admission of the testimony of Dr. Bieligk and Dr. Sticca, both of whom were called by Dr. Sugarbaker as expert witnesses, arguing that these doctors did not address a national standard of care for surgeons and that their testimony established only a "Sugarbaker standard of care." We conclude that the trial court did not abuse discretion in admitting the expert testimony of Drs. Bieligk and Sticca on the national standard of care.

■ "The trial judge 'has wide latitude in the admission or exclusion of expert testimony, and his or her decision with respect thereto should be sustained unless it is manifestly erroneous.'" *Coulter v. Gerald Family Care, P.C.*, 964 A.2d 170, 189–90 (D.C.2009) (quoting *Hawes v. Chua*, 769 A.2d 797, 801 (D.C.2001)). In *Hawes*, we summarized the minimum requirements for testimony on the national standard of care as follows: "(1) it is insufficient for an expert's standard of care testimony to merely recite the words 'national standard of care'; (2) such testimony may not be based upon the expert's personal opinion, nor mere speculation or conjecture; and (3) such testimony must reflect some evidence of a national standard...." 769 A.2d at 806. Once an expert has satisfied these minimum requirements, he or she may properly testify as to the national standard of care. *See Aikman*, 975 A.2d at 161.[2]

---

**1.** STANDARDIZED CIVIL JURY INSTRUCTION FOR THE DISTRICT OF COLUMBIA, § 9.06 (rev. ed. 2002) states:

A doctor is not negligent simply because [his] [her] efforts are not successful. Unsatisfactory results from treatment or care alone do not determine whether the defendant was negligent in treating the plaintiff.

However, if the doctor's performance fell below the standard of care and thereby proximately caused the patient's injuries, then the

doctor was negligent. In such circumstances, it is no defense to a charge of negligence that the doctor did the best that [he] [she] could and that those efforts simply were not successful.

**2.** The burden is on plaintiffs' experts—not the defense—to present testimony concerning the national standard of care by a preponderance of the evidence. *See Hawes*, 769 A.2d at 806.

Dr. Bieligk's medical studies and practice had taken him to Oklahoma, Louisiana, New York, and Maryland. At trial, Dr. Sugarbaker's counsel asked Dr. Bieligk if he was familiar with the "national standard of care of a surgical oncologist with regards to undertaking frozen sections prior to proceeding with the extensive removal of organs during second look operative procedures and situations such as this?" Dr. Bieligk said he was familiar with the national standard of care because he "read the literature, . . . attend[ed] the conferences [where] we discuss this type of problem, I manage these patients, . . . operate on them, [and] I make those decisions myself." Dr. Bieligk specifically mentioned a "specialty session on carcinomatosis" of the American College of Surgeons he had recently attended.

Similarly, when asked if he was familiar with the "national standard of care of surgical oncologists in connection with proceeding with second look operations," Dr. Sticca explained that he was familiar with the national standard of care from his own experience interacting with "people all over the country with these types of diseases . . . asking for opinions . . .,"; attending meetings "both nationally and internationally . . . hear[ing] what other peoples' experiences are and how they treat these [situations] and their management recommendations [ ] which have led to, I believe, a consensus of opinion among the group of physicians that treat these diseases"; and reading publications and attending lectures on the subject. Dr. Sticca had practiced in South Carolina and at the time of trial was at the University of North Dakota.

■ To establish the national standard of care, the medical experts were required to testify about the "course of action that a reasonably prudent [professional] with the defendant's specialty would have taken un-

der the same or similar circumstances." *Ray v. American Nat. Red Cross*, 696 A.2d 399, 404 (D.C.1997) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984)); *see Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C.1979) ("[T]he duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes. It is this notion of specialized knowledge and skill which animates the law of professional negligence."). This is exactly what Dr. Bieligk and Dr. Sticca did.

Drs. Bieligk and Sticca testified that they participated in the Peritoneal Surface Oncology Group, which they described as "a group of surgical oncologists with a special interest in peritoneal surface disease." There are about "30 to 40 doctors between the United States, Europe, [and other countries]" who participate in the Peritoneal Surface Group, including one of appellants' experts, Dr. Goldfarb. It is clear from their testimony, in short, that the defense experts referred to a standard that was national, not local, and to views that were not personal or speculative, but generally accepted within a defined medical community. *See Aikman*, 975 A.2d at 161 (referring to "conferences . . ., scholarly literature . . ., and national surgical society meeting[s]" (quoting *Strickland v. Pinder*, 899 A.2d 770, 774 n. 2 (D.C.2006))).

Appellants complain that "[t]here are no standards for surgical oncologists" and that Drs. Bieligk and Sticca testified only as to what Dr. Sugarbaker and his followers practice. While appellants correctly point out that Drs. Bieligk and Sticca relied heavily on the standards that have been established by Dr. Sugarbaker in his practice and writing, both Dr. Bieligk and Dr. Sticca testified that they were familiar with the national standard of care for physicians who specialize in the kind of second look operation Dr. Sugarbaker performed

on Mr. Kordas. Within this national group of specialists, they testified, Dr. Sugarbaker was recognized as "one of the more prominent people in this [area of medicine] and certainly [has] established a lot of the standards that we have."

We reject appellants' argument that to establish the national standard of care, only expert testimony of what a "Board Certified General Surgeon" would have done should have been allowed. All of the experts were board-certified general surgeons. Appellants' experts, Drs. Leff and Goldfarb, testified as general surgeons; appellee's experts, Drs. Sticca and Bieligk, additionally testified as specialists in the particular procedure. Although our adoption of a rule requiring reference to a national standard of care was based in part on the medical profession's practice of national certification in certain recognized areas such as general surgery, *see Morrison*, 407 A.2d at 564–65, we have never defined the permissible scope of the expert testimony itself to include only testimony about what would be done by a physician holding a particular Board certification without regard to specialization within the certified area. Instead, we have repeatedly stated that the national standard of care against which a defending doctor's actions should be measured must be that of a physician under the "same or similar circumstances." *Ray*, 696 A.2d at 404. That is how the jury was instructed in this case.[3] In their testimony, Drs. Sticca and Bieligk sought to establish the national standard of care of what appears to be a fairly limited group of specialists through-

out the country who treat a rare form of cancer. We, therefore, hold that the trial court did not abuse its discretion in permitting the jury to hear expert testimony from doctors who were general surgeons as well as from surgeons with a more specialized practice. It was up to the jury to weigh their testimony and determine the national standard of care of a surgeon performing a second look operation on a patient with Mr. Kordas's condition.[4]

For the foregoing reasons, the judgment of the trial court is

*Affirmed*

---

**3.** The jury was instructed:
    Doctor Sugarbaker is a nationally certified specialist in surgery. The standard of care for a nationally certified specialist is to have and to use the same degree of care, skill and learning that are ordinarily possessed and used by a nationally certified specialist in surgery acting in a reasonable and rou-

tine manner in the same or similar circumstances.

**4.** As the trial judge noted. "It is for the jury to determine what weight to give and whether [the doctor's] additional knowledge as someone that does this surgery is more valuable than just a general surgeon."